ONA STOGSDILL, Plaintiff-Appellee, Cross-Appellant, *v.* MANOR CONVALESCENT HOME, INC., *et al.*, Defendants-Cross-Appellees.— KENNETH N. HIATT, Defendant-Appellant.)

Second District (1st Division) No. 75-20

Opinion filed January 29, 1976.

Gates W. Clancy and James S. Mills, both of Geneva, for appellant.

Henry Burt, of Rathje, Woodward, Dyer & Burt, and O'Connor & Piccione, both of Wheaton, and Mahoney & McArdle, of Chicago, for appellees.

Mr. JUSTICE HALLETT delivered the opinion of the court:

Ona Stogsdill sued Dr. Hiatt (formerly her physician), the Manor Convalescent Home (in which she had been a patient), and Irene Genetske (a co-owner and supervisor of the Home), for damages suffered by her when her left leg was amputated as a proximate result of allegedly deficient medical and convalescent care. At the close of the plaintiff's case, the court directed a verdict for the Home and Genetske, and the case proceeded to verdict as to Dr. Hiatt. The jury found for the plaintiff and against the defendant and assessed the "general damages" at $40,000, and the "punitive damages" at $80,000. The court, after hearing and denying post-trial motions, entered judgment on the verdicts. Dr. Hiatt appeals from the judgment against him, and the plaintiff cross-appeals from the directed verdict and resulting judgments in favor of the Home and Genetske. We shall not here set out the many contentions made but the net result is that we reverse so much of the judgment against Dr. Hiatt as includes "punitive damages." In all other respects, the judgment is affirmed.

## The Facts

In 1968, Mrs. Ona Stogsdill, a stroke patient, came to live in the Manor Convalescent Home in Glen Ellyn, Illinois. In 1971, her son notified the Manor that Dr. Hiatt would be her doctor. Early in August, 1972, she developed a decubitus ulcer on her left ankle. Some time before November 7, 1972, gangrene developed; one of the nurses at the nursing home testified she noticed gangrene in August or September. Dr. Hiatt prescribed certain medicines but did not prescribe any antibiotics until November 6; he also did not use wet soaks, order lab workup, vascular studies, hospitalization or consult with another physician. He did not increase the pain medication. At no time were either her son or her daughter informed by anyone that she had gangrene. On November 7, 1972, her son called another physician; Mrs. Stogsdill was taken to a hospital. Her leg was amputated on November 10, 1972.

At the trial, the defendant presented no evidence and the only witnesses were those called by the plaintiff. Dr. Hiatt had been a general practitioner in Illinois for 46 years and in that time had become familiar with the care and treatment of cardiovascular patients and stroke

patients. Called as a witness under section 60, he testified that when he was requested by Mr. Stogsdill to see his mother, he told him that he did not make regular calls but that he would come to see his mother when he was requested to. His second visit was made on December 20, 1971, at the request of Mrs. Genetske. She possibly had had a small stroke and she showed signs of senility. On August 14, 1972, the nursing home called saying that she had possibly lacerated one ankle from the wheelchair. He visited her the next day. She had a small ulcer on the medial side of her left ankle. While he stated that to his knowledge she was not incontinent (unable to contain her urine) at that time, he acknowledged that she was incontinent or partly incontinent in April, 1972. He diagnosed the ulcer in August as being a pressure ulcer due to the fact she put her good leg over her left ankle and rested her weight on it. It was about the size of a dime and was not edematous (no swelling of the tissue). At that time he requested she be kept on the general diet she was already on. He stated that in a manor the general diet is usually a high protein diet; however, Mrs. Genetske had already testified she was on a general diet, a soft diet and it was not a special high protein diet. Dr. Hiatt did not know if any other nursing home has a diet other than a general diet. For the ulcer, he prescribed vioform of hydrocortisone, and ordered that the dressings be changed frequently and the area be well padded because she persisted in resting her good leg on top of the ulcerated area. He also told the nurse to call him if she noticed any rapid increase in size. There are always problems in healing these ulcers in elderly people so one must be especially careful in watching the sores. Later in August the nursing home called him, concerned that it wasn't healing fast enough. He went out to the nursing home on August 24, 1972, and saw that the ulcer was a sluggish ulcer; one that does not get better or worse. She had, at that time, a fair circulation in the foot; the tibial artery was palpitating and the temperature of the toes was good. At all times when he treated her there was circulation in her foot and in his opinion it was adequate circulation to heal the ulcer. There is no record that he changed his medication or course of treatment at that time. He did not utilize the services of the home's physical therapist; he did not utilize their facilities for whirlpool treatments; he never used wet packs; he did not prescribe an indwelling catheter; he never ordered any lab work to determine what type of bacteria or infection was in the ulcer; while he had frequently consulted with other physicians in the arterial surgery area, he never did in connection with her problem; and he never ordered any vascular studies done or hospitalization so that vascular studies could be done. He testified that he was never informed of any problem with regard to urine

soaking the bandages or the area of the ulcer; however, the nursing records, while he had testified he always reviewed after they were written, indicated that there was a very serious problem with incontinency and that she continued to wet the chair. On September 7, he prescribed some medicine by telephone for an unrelated purpose. According to the medical records the ulcer had now increased possibly to the size of a quarter. On September 15, 1972, he approved, by telephone, the use of a safety belt and prescribed compazine intra-muscular for nausea. Dr. Hiatt did not remember if he inquired as to the status of the ulcer at that time. He next went to the nursing home on September 26, 1972; he did not remember if this was in response to a request or not. At that time, he examined Mrs. Stogsdill; some of the nurses were present. The ulcer was about the size of a quarter, had slightly deepened, was brown in color and of course had necrotic tissue as has any other ulcer. There may have been a little swelling. The tibial artery was hardened but there was pulsation going through it. In other words, she was getting adequate circulation to her toes. Her toes were warm which also indicated adequate circulation. He could not say if the circulation was adequate then for healing but there had been no doubt in his mind at that time that it was. But he is never sure of anything although he did believe at that time that there was adequate circulation to maybe heal the ulcer. He did consider consulting a specialist but decided not to. He also decided it was not serious enough to do a vein ligation. He also rejected debridement (taking the dead tissue away because it infects the other tissue); manual debridement was rejected because of the paralyzed leg and the very poor capacity for healing. He also decided not to recommend hospitalization. He did not prescribe anything new; he did order vasodilan; he did give a sleeping capsule and told them to continue with the restraint because she was constantly putting her good leg on top of her bad one. (However, the restraint as he had described it earlier was merely a safety belt or jacket and would not appear to have any effect on her movements below her waist; it only restricted the motion of the area around the waist "very little.") He did not see her again until October 26, 1972; no one from the nursing home called. As far as he could recall he made no effort to call them. Also, he did not call either her son or daughter and discuss her condition with them. When her son wished to see him out at the nursing home, the doctor told him he would discuss the ulcer at his office but not at the nursing home. On October 26, he next visited her. He found extensive arteriosclerosis of a cerebral type. She had a little fever but that was compatible with respiratory infection. The ulcer was worse. He examined it in the presence of the nurses. It was about the same size; it was possibly a little deeper.

The infection was down to the fascia. He noticed no odor. He denied that the ulcer was cyanotic looking although in his deposition he had said that it was "reddish-brown, cyanotic looking." The circulation was adequate for circulation; it was possibly adequate for healing. Because of the necrotic tissue, he ordered elase (a form of debridement); that was the only new medication ordered. She did not make any complaints about pain on that or any previous visit. She had been given empirin for pain since 1971; this dosage was not changed nor was any other pain relief medication given. He still did not consult with any other physician or hospitalize her and although there might have been a secondary infection in the ulcer, he did not order a blood workup or lab testing of any kind of that infection. He did not check for possible toxicity although he noticed her medical condition had slipped rapidly. He also did not check to see what her diet was. He did not believe that she was in a toxic state on that date. She had no fever. There was very little edema around the ankle. He diagnosed the condition on October 26 as a pressure decubitus ulcer due to the keeping of one well leg on top of her paralyzed leg where the pressure point was. At no time did he diagnose the ulcer as being gangrenous.

On November 6, 1972, for the first time he prescribed terramycin. He also gave her some empirin.

Dr. Hiatt agreed that it is important that the site of the ulcer be kept clean and free from germs. Urinary incontinence could aggravate an ulcer if it reaches the site of the ulcer. He did not, however, prescribe an indwelling catheter; elderly people do not do so well with indwelling catheters. The accepted medical standard of treatment for a decubitus ulcer is antibiotic ointment, cortisone ointment. Lately they have tried sugar. Improvement of the nutritional status is an important factor. All elderly people should be on a high protein diet; a high nitrogen diet and plenty of meat which is what he gives all his elderly patients. A high vitamin diet is necessary. He agreed that the Merck Manual, which he followed like a Bible, suggested the matters just mentioned as a course of treatment including I.V. injection or protein hydrolysates. When plaintiff's counsel asked if the Merck Manual recommended that large doses of antibiotics be used, Dr. Hiatt answered that you have to be careful with older people in giving them large doses. He admitted that he did not order an antibiotic until November 6, 1972.

Barbara Watts, who has been a registered nurse for 26 years, worked at the Manor from April or May of 1971 through January, 1973; during that time, she had occasion to know and care for Ona Stogsdill. Refreshing her memory from the medical reports, she noted that Dr. Hiatt saw Mrs. Stogsdill on August 24, 1972. He told her to elevate her leg

and she would not. At that time she had an open sore on the outer ankle bone of her left leg. There was a slight drainage from the sore. The nurses had been trying to get her to elevate her leg but as soon as they would get it up, she would put it down again. Mrs. Stogsdill could not move her left leg. She had a contracture and the leg was drawn up to the body. It was bent both from the hip and from the knee. She usually kept her right leg down in a normal sitting position with the foot down to the floor and her left leg was drawn up on the foot pedal of the wheelchair. She would not rest the left leg up on top of the right leg. She also would not keep it up on the leg extender from the wheelchair. She wanted her left leg tucked up. She would usually rest the sore leg on the other leg or the seat of the chair. This also was true when she was lying down in bed. Again, after refreshing her memory from the medical records, she testified that on September 7, the plaintiff was constantly asking to see her doctor every day, to have him come and look at her ankle every day. On September 8 or 9, she was still asking to see her doctor and her son. Mrs. Watts did not call the doctor on September 9 (she did call the doctor on one day as to the vaginal bleeding). Mrs. Watts also did not call Mr. Stogsdill.

On September 15, 1972, Mrs. Stogsdill was feeling a little better. She kept bending over to fuss with the bandages on her ankle and appeared as if she was going to fall out of the wheelchair. The witness called Dr. Hiatt and he ordered a safety belt restraint. On September 28, 1972, she leaned so far forward in her chair she almost did fall out. So they put two restraints on her. She was quite weak at that time and needed assistance with her feeding. However, Mrs. Watts did not call Dr. Hiatt and advise him of it. On October 7, Mrs. Stogsdill was feeling a little stronger and did not need the safety restraints. She accused them of trying to murder her. Testifying from the entry from October 13, she testified that Mrs. Stogsdill was usually wet from urine, not soaked but slightly wet and her foot was becoming a little more swollen. On October 20, 1972, she was complaining of pain in her leg and foot. Indeed Mrs. Stogsdill had numerous physical complaints which she would relate to the doctor on every visit; the ankle was included on her list of usual complaints from August on. On October 28, she wriggled out of her safety belt and was found leaning forward in her chair; she appeared to be asleep or unconscious. She got angry with the nurse because the nurse would not let her take the bandage off of her ankle. She was weak at that time. Mrs. Watts would not consider Mrs. Stogsdill a problem patient however; while she created problems, it was not unusual. Mrs. Watts did believe that the area of the sore would become more irritated with her fussing with it. One of the reasons Mrs. Watts

would have to change the dressing was that Mrs. Stogsdill would pull it off. Another reason was that urine and feces would get on and about the dressing area; it would not get on the dressing on the ankle however. This problem deteriorated over this period of time.

Mrs. Watts first noticed the foul odor from the sore of the ankle in September or the first of October. It was undescribable. It was noticeable. The odor was the same from the time she first noticed it until the time Mrs. Stogsdill left the nursing home. Mrs. Watts, in the course of her experience as a registered nurse, has had occasion to see, understand, and recognize necrotic tissue and gangrene. She first noticed the gangrenous condition in Mrs. Stogsdill's foot in August or September, 1972. She did not tell Dr. Hiatt. As she stated, "I don't tell physicians the condition—the diagnosis of their patients." It also was not her job to notify the person responsible for a patient of the condition of that patient. It was the job of the administrator of the nursing home. It was, however, just as much her responsibility to contact someone if there was an emergency problem as it was anybody else's.

On cross-examination she indicated that there can be a difference between necrotic tissue and gangrene. The areas that were healing had some necrotic tissue around them. It appeared to be healing slightly around one of the edges, looked as if it was going to heal. This opinion of hers changed in time. Mrs. Watts always cleansed the sore, when changing a bandage, with hydrogen peroxide. She acknowledged that the first written entry she made concerning the odor was on November 3, 1972.

Mrs. Watts also testified (the court instructing the jury that this testimony was not admissible as against Dr. Hiatt) that other employees had conversed with her in regard to the odor or the smell of the condition of Mrs. Stogsdill's foot. This was on more than one occasion. However, she did not recall the dates.

Mrs. Genetske, the owner, operator and president of Manor Convalescent Home, was called under section 60. She is a licensed practical nurse. She assisted in the care and treatment of the patients. She is on the floors all the time and supervises the aides, the registered nurses, takes care of the treatments and medicine. The Manor is an intermediate care facility. There are certain rules and regulations of the Illinois Department of Public Health that pertain to the home; it is run in accordance with those rules. In conformity with the rules they keep medical records. (The court allowed the use of the records as refreshing recollections, but refused to allow them or any part of them in as business records, even those portions made by the witness herself (namely Mrs. Watts) in the course of her job and vouched for as true and correct. In

general moreover, they were not allowed in as admission against interest, against the party making them.) The Manor did employ a physician, Dr. Kuharich, to prescribe for the overall care of the residents in August, 1972, and prior thereto. He was on 24-hour call and examined Mrs. Stogsdill once or twice before they got a doctor for her. At the time Mrs. Stogsdill was admitted to the home (April 9, 1968), she was suffering from a condition of partial paralysis as the result of a stroke. She was notified by letter that Dr. Hiatt would care for Mrs. Stogsdill and she was advised to contact him directly whenever she thought it necessary. Dr. Hiatt saw Mrs. Stogsdill several times before August, 1972. In April, 1972, she was incontinent.

On August 3, 1972, they first noticed that Mrs. Stogsdill had a problem on her left ankle. She had rubbed a blister on it during the night. Her ankle was red and swollen. Sores, cuts and abrasions on the lower extremities are a problem. Whether they are difficult to heal depends on the patient. It is a problem to heal sores in an area such as that in elderly people who have a stroke condition or a circulation problem. Mrs. Stogsdill was such a patient. Also, on August 3 and 4, 1972, she had very little control of her bladder or her bowels. That resulted in what we commonly call wetting her pants. They tried to train her to go to the bathroom every certain length of time and also they used pads underneath her so they could keep changing them to keep her dry. They used soft materials and pads made of materials; they would fold blankets up and put them underneath her. The plaintiff did not have a catheter although some patients at the home did. No one called Dr. Hiatt at this time. The nurses during August cleaned the sore with peroxide; this was not prescribed by Dr. Hiatt. The bandage on her ankle was changed four or five times a day or oftener. She was incontinent during that time and at night the bandage would become wet with urine if they did not watch it. She said it did not become wet with urine when she sat in the chair. When asked if she remembered stating in her deposition that the bandage would become wet with urine while she sat on the chair, Mrs. Genetske replied that it became wet in bed but not in the chair. It was later stipulated that at the deposition that question had been asked and that answer given. On November 6, she showed Mr. Stogsdill his mother's ankle and told him that she had done everything the doctor said to do. Mrs. Genetske testified she was familiar with gangrene. She at some time noticed the condition of the patient's ankle as being gangrenous but she did not remember just when. She did not tell Mr. Stogsdill; she had no right to tell him. She did not tell the plaintiff's daughter, Mrs. Sowa. She did not tell Dr. Hiatt; she did not make the calls to Dr. Hiatt; rather the registered nurses did. She agreed that

gangrene is a serious condition and an unusual happening. At this point, plaintiff introduced into evidence the Minimum Standard Rules and Regulations of Long Term Care Facilities that are promulated by the Illinois Department of Public Health. Rule 03.03.01.00 provides that the resident's family shall be notified immediately, if possible, of anything unusual happening to the resident such as accident, sudden illness or disease. Mrs. Genetske also never informed the house physician of the gangrene or asked him to examine Mrs. Stogsdill. They also never prepared an individual written care plan as required by rules although they did write a care plan on everyone. No wet soaks were given to Mrs. Stogsdill nor any whirlpool treatment. She was just given a general soft diet, not a special high protein diet. No laboratory tests were made.

Dr. Barnett, a physician from Wheaton, licensed to practice medicine since 1937 and in Illinois since 1964 and who is on the staff on the Du Page County Home and who visits most other nursing homes, saw Mrs. Stogsdill, at her son's request, on November 7, 1972. At that time, she was generally very debilitated, very weak, almost terminal. Mentally, she was very poor. She had a large ulcer involving the entire outer surface of her left ankle. There was a rough kind of bandage on it covering the entire ulcer area. The ulcer was at least five to six inches long, probably two or three inches across. It involved the whole outer surface of the ankle and extended into the bone and involved the tendons and muscles of that area. The center part of it was dead rotting tissue, wet and very foul smelling and the margins were red and inflamed. The dead tissue extended down to the bone and involved the surface of the bone. The odor was a very foul-smelling odor that one often has with decomposing tissue. He diagnosed it at the time as a wet gangrene involving the entire outer surface of the ankle. The condition was threatening her life. In view of the fact that she had had this for several weeks and was not getting better, indeed seemed to be getting worse and was beginning to show signs of toxicity, he recommended an above-the-knee amputation as the only possible treatment to save her life. He also recommended that she be admitted to the hospital where they could get further treatment and consultation with surgeons. She was admitted to the hospital the same day. He ordered a general workup including laboratory chest x-ray, electrocardiograph, continuous wet soaks to the ulcer, pain medicine, full liquid diet, full changing position frequently and antibiotics (ampicillin) given by intramuscular injection. The blood studies showed her to be severely anemic. She was down to 7 grams, about half of what she should be and also showed low protein content of her serum. He consulted with Dr. Jorden, an orthopedic surgeon. Dr. Jorden also recommended amputation. They waited until November 10, 1972, for the

amputation to try to build her up for surgery. They tried to take care of her nutrition. They gave her antibiotics, transfusions of blood, intravenous fluids and intravenous feedings. The operation was successful. She had quite a stormy course afterwards and was in the hospital until December 5, 1972. On the day she was discharged her general condition was fair. He has seen her periodically since and on the last visit, August 12, 1974, she was in fair condition. She was partially mentally alert but she could not care for herself. In view of her mental capacity and alertness on that date, he did not believe she could accurately recall dates of treatment, types of treatment. Attempts were made by counsel for the Manor to inquire whether he believed she was mentally competent on that date. The objection was sustained, as considering their previous agreement in chambers that mental incompetency alone did not deny her the right to testify, it was an absolutely bad question. Plaintiff's motion for a mistrial was denied however, as was the defense motion for a mistrial because the first motion was made before the jury. The witness also testified that the amputated leg was submitted for pathological examination; he agreed with those findings. As part of the consultation with Dr. Jorden, and also based on the findings of the pathologist it became clear to him that the severed leg had its circulation system occluded. Age would be a factor in this occlusion. The cause is arteriosclerosis. This is a condition she had long before November 7, 1972. There is no way skin can survive if blood does not get to it. People suffering from arteriosclerosis can have sufficient indirect circulation to support healthy tissue yet the same system may be unable to support injured tissue and there is nothing any physician can do about that condition.

Dr. Barnett also stated that he was familiar with what the medical procedures are in connection with the care and treatment of decubitus ulcers. One must take care of the general condition of the patient; take care for the general nutrition; the general care in bed or being up and then the care of the ulcer itself. Nutrition has the significance that the better the condition of the patient, the better they will overcome an illness. The patient should have a full, normal balanced diet with adequate proteins, adequate vitamins, minerals and carbohydrates. If the position of the patient is not changed, pressure develops over the pressure points and the skin breaks down and the tissue underneath it must break down. Once an ulcer develops, the general standards of the medical profession are to keep pressure off the area entirely, to get rid of any necrotic tissue as quickly as possible and institute local antibiotic treatment, soaks, everything possible to increase the circulation of that area in order to promote healing conditions. Incontinence must be cared for. Urine spreading around the skin, if it is kept there, will irritate the skin.

The accepted medical practice is to keep the skin clean and dry. They try various things to alleviate the incontinence, including ordinary pampers and diapers. They go to catheters as a last resort. To increase circulation to the affected areas and the areas around it, they use wet soaks, wet baths, Hubbard tanks, whirlpool and try to keep the nutrition up as well as possible. They get rid of any necrotic tissue through various digest enzymes and also through surgical removal. If the ulcer does not respond (they give reasonable time to it) the next steps are, besides excision of necrotic tissue, excision of a whole area and skin grafting. The final method if they cannot remove it is amputation. As far as he knew these were the standard procedures in Du Page County and in the metropolitan Chicago area.

Dr. Farag Loutfy, a specialist in internal medicine, who came to the United States in 1958, had his residuary in internal medicine at Illinois Masonic Hospital, and his year of rotating internship at Grant and Ressurection Hospital, has his office in Buffalo Grove and is presently on the staff of a Park Ridge hospital appeared as a witness over Dr. Hiatt's objection that he was in another county and another community. The court overruled this objection on the grounds that locality cannot be construed so narrowly as to be determined by county lines and also took judicial notice of the fact that Buffalo Grove is very near the Du Page County Line, in what he would call the metropolitan area and with the means of communications and textbooks and so forth nowadays, he believed the "locality" is a very broad one. He also overruled the argument that only a general practitioner could testify against a general practitioner; the internist having no knowledge about the general practice of medicine in the United States. In response to plaintiff's hypothetical question he stated that the doctor's conduct, knowledge and exercise of knowledge, care and skill was below the standard. The lesion should have been examined thoroughly. If there was any infection there and the infection seemed to be getting worse with sweating and inflammation, the patient should have been hospitalized as early as possible. If immediate hospitalization was not available, he would attempt to put the patient on antibiotics, put her in bed, elevate her leg, apply warm compresses. If she did not respond within the next week at most, he would put her in the hospital anyway and from the hospital have the cultures made, sensitivity to antibiotics made, determine if she is a diabetic and the general overall care for the general health and improving her resistance and treating the local condition, not only locally but also with antibiotics. Consideration of diet or nutritional intake would be significant. Nutrition is important in the healing process in a condition like this. If her blood testing proves that she is low in albumin and globulin and her general

condition is deteriorating or she is dehydrated or undernourished, she might be helped with proper diet, proper vitamins, even intravenous feeding. If she is anemic she would be given blood transfusions, if necessary, or blood-building medications. The condition of incontinence and the urine wetting of the bandage would add to the problem. A wound like this has to be thoroughly cleaned, thoroughly kept under antiseptic conditions, nothing contaminating it. Urine would pass through, seep into the dressing, would impede the healing and add to the infection. Catheterization is a solution.

Considering the hypothetical facts, including the facts that the doctor found adequate circulation to heal the sore in August and September, Dr. Loutfy believed, was of the opinion, based on a reasonable degree of medical and surgical certainty, that with proper care and treatment the leg could have been saved. Dr. Loutfy particularly emphasizing the fact that the circulation was fairly adequate, being warm enough, and pulsations were present.

On cross-examination, he testified that if all of the facts that were in the hypothetical question were not within the mind of the doctor, then his opinion about the doctor's conduct would be materially affected. He stated that whether he would rely on the nurses' information depended on what was relayed to him. He would evaluate it according to what he heard and determine whether it was accurate but assuming that the doctor knew all of the facts enumerated in the hypothetical question, he could rely on the employees of the nursing home informing him of the medical facts. Assuming that after the amputation it was agreed that the blood supply to her leg was occluded and nothing could have been done to open that blood supply, whether his opinion would be changed would depend on where the occlusion was. There is a conflict between the doctor's report saying the pulsations were palpable and the temperature of the foot warm enough and the report of complete occlusion. The occlusion could have occurred later on, secondary to the infection that had been prevailing for a long time. In answer to a question whether, assuming it was agreed that the leg was occluded and it was occluded from arteriosclerosis of long standing, it could not have occurred later, could it, Dr. Loutfy said that there was no way of telling if it occurred later or before. The surgeon and the pathologist were getting the facts as they are now. He did not believe anyone could tell what happened unless the patient was examined before and then they examined the reports that there were pulsations in the artery. Then you are assuming it is open.

Dr. Loutfy also testified that in the course of his practice he has had occasion to come in contact with and be assisted by both registered and

licensed practical nurses and he is familiar with the standards of professional activity to be experienced by them. He is not on the staff of any nursing home. Nurses should not treat the patient without specific orders from the doctors. She has certain limits and capabilities. She can do certain things but she cannot treat a patient on her own. She would call the doctor, inform him what the condition is, and carry out what the doctor orders. It is her responsibility when she talks to the doctor to describe what she sees there, try to inform him of what the condition is and from there on he will have to see if it is fit to go and see the patient and examine her himself. It is not the violation of any standard to call a doctor when a condition becomes apparent and to use the most practical means like peroxide and to then communicate that condition to the doctor and have him come and examine. Remembering the facts as stated in the hypothetical question, he did not think they really did the full right thing. When this answer was objected to as not being responsive, the court ruled that the witness had answered the question whether the personnel did that which was required of them "no" and the witness agreed. (The witness' concern may have been the time they called the doctor, but he was not allowed to develop or explain his answer.) The witness agreed that there is a significant difference between a nursing home and a hospital in the level of care. The hospital has the lab, a higher standard of treatment and follow-up, capacity of testing and evaluating in detail.

Mr. William Stogsdill, Mrs. Stogsdill's son, testified that his mother's health in June or July, 1972, was pretty good except that she had had a stroke (which is why she was in the nursing home). Her left arm was paralyzed and her left leg was partially paralyzed. She sat in the wheelchair normally. When he first noticed the sore on his mother's leg in August, it was very small; like the end of a pencil eraser. Early in September, she was having trouble sitting up in the wheelchair and her left leg was beginning to constrict and draw back. While he didn't notice the sore in particular when he was out there in September, he called Dr. Hiatt and asked him about his mother's condition. Dr. Hiatt replied that she was quite up in years and that this leg would possibly constrict more and eventually she would be bedridden. That was the extent of the conversation. When he saw his mother early in October, her leg was drawn more, the bandage was growing larger, looked almost as if she was wearing a small boot and she appeared to be in pain. When he asked the nurse what they were doing for the sore, the nurse responded that they were removing the bandage once daily and applying ointment to the area (the jury was instructed that this evidence did not apply to Dr. Hiatt). Mr. Stogsdill was not sure how often he saw his mother

in October, as he is in and out of town because of business; he might be there two or three times a week or he might not be there for two or three weeks. Her condition got worse during October. One night when he was there she was screaming pretty bad for a pain pill to relieve the pain although she had been given a pill an hour or two previously and they were spaced four hours apart. They gave her another pain pill and that seemed to help but she was still moaning. When he saw her early in November her condition was much worse and she was screaming with pain. She had been moved to another room, he was told that she had been moved because of the disturbance she was creating. (Again the jury was instructed that this evidence did not apply to Dr. Hiatt.) He called Dr. Hiatt in November and asked him if he thought they should get her to a hospital. He responded that he saw no reason to move her, she was going to get as good care at the Manor as she would at a hospital. When asked if he would meet Mr. Stogsdill at the nursing home, at the doctor's convenience to look at her, he refused, saying that his schedule did not permit him to do that. The condition was getting worse by the hour. He contacted Dr. Barnett and Dr. Barnett met him at the nursing home on November 7, 1972. Dr. Barnett showed him his mother's ankle. The ankle and foot were all rotted away. It was turned black and there was an actual hole. You could see the bone, etc. There was an odor. While waiting for the ambulance, he talked with Mrs. Genetski. She told him she had been treating the sore with sugar because it tended to keep the smell down. (Again the jury was instructed that the evidence did not apply to Dr. Hiatt.)

Mrs. Sowa, the plaintiff's daughter, testified that she visited her mother on August 24. She was suffering. There was severe pain and the leg had a huge bandage on it. Her leg had become more drawn than it had been around August 1. Around October 1, her mother had grown progressively worse. She was weaker. Her face reflected pain. Her leg was drawn and still had the huge bandage on it. Mrs. Sowa called Dr. Hiatt around the middle of October and told him how much her mother was suffering. She asked him to go see her mother and to tell her when he went so that her brother could be there so when Dr. Hiatt took the bandage off they could see the condition of the leg. He spoke harshly to her and said his time was valuable and he didn't know when he could go; he would just go when he could. (The jury was instructed the evidence was applicable only to Dr. Hiatt.) She next saw her mother around November 1. Her condition was worse, she was weaker. When Mrs. Sowa took her hand, her mother had no strength in it. She had been moved into a back room. Around the middle of October (just before Mrs. Sowa called Dr. Hiatt) Mrs. Sowa had been told by one of the

nurses that her mother was going to be moved to the back room if she did not behave herself. Mrs. Sowa mentioned how much her mother was suffering. (The jury was instructed that this conversation applied only to the Manor.) While Mrs. Sowa was at the home on November 1, the nurse told her she wanted to get Mrs. Stogsdill out of bed; that she had bedsores and it wasn't good for her to be in bed. Her mother was suffering so that she did not want to. Neither Dr. Hiatt nor Mrs. Genetske ever told her her mother had gangrene. On cross-examination she stated that she never smelled anything in August or on October 1. When asked if the same is true for all the other visits she answered, "I can't say yes." The bandage was always in place.

After a hearing in chambers to determine her ability to testify, Mrs. Stogsdill testified over the objection of counsel for Dr. Hiatt. Dr. Hiatt visited her in August, 1972. She told him her ankle was getting worse every day but he did not give her an answer. When he visited her later in August, he examined her ankle. She told the nurses about the ankle whenever they came in. In September her leg was swollen and the sore was bigger. It pained all over right up into her arm. They all knew about it. She could not remember if Dr. Hiatt came in September. She knew that he came in October. The sore was much worse at that time and it was "awful painful." She told him about it and he said, "oh, you are sitting here in a $200 chair." He did not prescribe any different treatment at that time. She asked him to do something more for her and when he would not answer her, she knew "he wouldn't do anything more for me." Dr. Barnett came to see her. She was suffering so bad she could hardly stand to move. They took her to a hospital and amputated her leg. She is all right now.

At the end of the plaintiff's case, the judge directed a verdict for the Manor and Mrs. Genetske, ruling as to both that no breach of duty had been shown and no causation. The court, refused, however, to direct a verdict for Dr. Hiatt for failure to show causation, refused to dismiss the claim for wilful and wanton misconduct and refused to grant a mistrial because of the dismissal of the other defendants. As we have already stated, the jury found for the plaintiff and against the defendant "general damages" at $40,000 and assessed the "punitive damages" at $80,000, on which verdict judgment was eventually entered.

## I

This brings us to Dr. Hiatt's first contention—that the complaint fails to state a cause of action for wilful and wanton misconduct and that the judgment based thereon is therefore void.

The first flaw in this contention is that Dr. Hiatt did not challenge the sufficiency of the complaint in the trial court and it cannot be raised

for the first time on appeal. This is particularly true where, as here, the complaint could then have been amended. And of course section 42(3) of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 42(3)), provides that all defects in pleadings not objected to in the trial court are waived. (*Gustafson v. Consumers Sales Agency, Inc.* (1953), 414 Ill. 235, 110 N.E.2d 865.) Furthermore, section 6 of the Amendments and Jeofails Act (Ill. Rev. Stat. 1971, ch. 7, par. 6) bars such a challenge at this point. (*Gustafson v. Consumers Sales Agency* (1953), 414 Ill. 235, 110 N.E.2d 865.) Furthermore, a very similar complaint in a malpractice case was upheld in *Church v. Adler* (1953), 350 Ill.App. 471, 484, 113 N.E.2d 327. We therefore conclude that this contention is without merit.

## II

■■ Dr. Hiatt also contends that the plaintiff was guilty of contributory negligence as a matter of law and that the court erred in denying his motion for a directed verdict on this ground and in allowing the jury to pass upon this issue. No cases are cited in support of this contention, and Dr. Hiatt's six-line argument is not at all helpful or convincing.

We assume that Dr. Hiatt's (unarticulated) argument is that the plaintiff, by resting her good leg on her bad leg and by fussing with the bandage, so aggravated the ulcer as to cause it to become gangrenous despite his skillful treatment. But Dr. Hiatt was fully aware of her actions and saw how she rested her leg but took no adequate steps to prevent it. Certainly her actions did. not prevent him from hospitalizing her, seeking assistance from a specialist or from having tests made to determine the nature and the gravity of the situation. In order to be guilty of contributory negligence, the plaintiff must have acted with knowledge and appreciation, either actual or imputed, of the danger of injury which his conduct involves. Senility of course seriously affects the ability to know and appreciate such dangers. One may be aware that one's doctor wants one to keep a leg up without, because of senility, understanding that he is concerned about some serious injury resulting. "Generally, a relaxed standard of care is required in the contributory negligence situation by persons who are subject to the infirmities of old age." (*Garner v. Crawford* (La. App. 1973), 288 So.2d 886, 888.) Likewise, where a patient is unable physically and mentally to care for herself, "[i]t logically follows she could not be held to the same degree of accountability as a normally healthy person." *Powell v. Parkview Estate Nursing Home, Inc.* (La. App. 1970), 240 So.2d 53, 57.

"The age of the plaintiff is also to be kept in mind. All that the law requires of an infant is a degree of care commensurate with its age and discretion. We think the same should apply to old people, whose senses

are blunted, and mental faculties impaired, by age. Like children, they are accustomed to intrust their safety to those who are younger and stronger mentally and physically than themselves; and within reasonable limits they may do so without being guilty of negligence." *Johnson v. St. Paul City Ry. Co.* (1897), 67 Minn. 260, 262, 69 N.W. 900, 901.

Likewise in *Kent v. County of Hudson* (1968), 102 N.J. Super. 208, 245 A.2d 747, *aff'd per curiam*, 53 N. J. 546, 251 A.2d 760, the court refused to allow the hospital to raise the defense of contributory negligence since the deceased, a 65-year-old man suffering from diabetes, arthritis, and a chronic brain syndrome, had placed himself in the custody and care of the hospital for the very purpose of protecting himself against its effects.

The Illinois Supreme Court in *Barnes v. Washington* (1973), 56 Ill. 2d 22, 305 N.E.2d 535, indicated that it was unwilling to rule that an incompetent adult should in all cases be afforded the same protection as the child of tender years in trespass cases since a landowner may be unable to foresee that a particular condition would cause a danger where the incompetence is unknown. But this is not the situation here. Dr. Hiatt had full knowledge of her mental condition since he was her physician.

All in all, we conclude that the question of contributory negligence on the part of the plaintiff was properly left to the jury and that the court properly denied Dr. Hiatt's motion for a directed verdict on this ground.

## III

■■ Dr. Hiatt also contends that the court should have declared a mistrial after the Home and Genetske had been directed out. Again, no citation in support of the contention is given, the only case cited by Dr. Hiatt (*Wright v. Royse* (1963), 43 Ill.App.2d 267, 193 N.E.2d 340) being dead against his position. Were such a view to be adopted, it would be impossible to sue multiple defendants for fear one or more might be directed out. Obviously, this is not the law in Illinois or elsewhere. Furthermore, Dr. Hiatt, although given the opportunity, did not request that the jury be instructed as to the effect of the dismissal. As to the evidence before the jury, this court is unable to understand how the existence of that evidence was affected by the mistrial. Had the other defendants not been dismissed, that evidence would still have been for the jury to consider. Its admission was due not to the dismissal but to the fact that the plaintiff had joined the defendants. Yet the defendant doctor never moved for a severance of the two claims or in any way suggested to the trial court that he would be prejudiced by the trying of the two causes of action in a single trial.

We therefore conclude that the trial court properly denied Dr. Hiatt's motion for a mistrial.

## IV

■■ This brings us to Dr. Hiatt's contention that the plaintiff's expert, Dr. Farag Loutfy, was not competent to testify (1) because he had never practiced in Du Page County, and (2) because he was a specialist, not a general practitioner.

Illinois does follow the "locality rule," under which a defendant doctor is bound to exercise such care and diligence as a good practitioner in a same or similar community would (but see *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill.2d 326, 331). The judge, in ruling that Dr. Loutfy was competent to testify took judicial notice, as we do, that Buffalo Grove, where he practiced, is only some 12 miles from Glen Ellyn, where the Home is located, both in the Chicago Metropolitan area, and held that "locality" would not be so narrowly construed as to bar an expert witness simply because he came from the next county.

The term "locality" has no precise meaning and varies with the facts of the particular case. The locality rule itself developed at a time when there was a significant difference between the opportunities for continued medical education available to a rural physician and those available to an urban one. And this was its cause and rationale. Moreover, most rural areas had no medical research centers and because of transportation problems a rural physician could not easily reach those in urban centers. (Comment, *A Review of the Locality Rule*, 1969 U. Ill. L. F. 96.) In *Weintraub v. Rosen* (7th Cir. 1937), 93 F.2d 544, the court took judicial notice of the fact that Springfield, Illinois, has a population of 70,000, that it is the capital of one of the greatest States in the Union, with respect to population, natural resources, general education and development, and is surrounded by medical colleges which rank very high and concluded that the neighborhood of Springfield or any other city similarly situated should not be too narrowly limited. Here, the two communities of Buffalo Grove and Glen Ellyn are in the Chicago metropolitan area with all the advantages that that entails. Likewise, in *Livengood v. Howard* (1973), 11 Ill.App.3d 1, 295 N.E.2d 736, a specialist from Chicago testified as to the standard of care although he had never been in Peoria nor practiced in the Peoria area. The court noted that he testified that the same standard applied. In the present case, Dr. Barnett testified that the procedures he had described were the accepted procedures and the standard procedures in both Du Page County and the metropolitan Chicago area.

In *Avey v. St. Francis Hospital & School of Nursing, Inc.* (1968), 201 Kan. 687, 442 P.2d 1013, the Supreme Court of Kansas, following the same locality rule, held that a doctor from Topeka should have been allowed to testify although he had never practiced in Wichita where he stated that the standards of care were the same. And the Supreme Court of California, in *Lewis v. Johnson* (1939), 12 Cal. 2d 558, 561, 86 P.2d 99, 101, in holding that doctors from Los Angeles could testify as to the standard of care in Long Beach (also in the same country) remarked that: "\* \* \* But to make the exclusion rest arbitrarily upon a geographical line separating two cities of the same county, with almost identical medical service, would be a misuse of the rules of evidence and an unjustifiable emphasis on empty technicalities." We therefore conclude that this contention is without merit.

The defendant also complaints (2) that, in effect, he was held to an unreasonably high standard of care because Dr. Loutfy was a specialist in internal medicine and not a general practitioner. It is true that in many States a specialist is held to a higher standard of care. (61 Am. Jur. 2d *Physicians, Surgeons, and Other Healers* § 119 (1972).) However, the Illinois Supreme Court, in *Schireson v. Walsh* (1933), 354 Ill. 40, 187 N.E. 921, a case involving the revocation of a specialist's license to practice on the grounds of gross malpractice, rejected the idea that since the doctor had held himself out to be the world's leading plastic surgeon he had to possess a much higher degree of skill than is expected of the average physician, saying, at page 56:

> "If it is a correct rule, then we would have varying degrees of skill required when a charge of malpractice is made against a physician \* \* \* in a civil suit for damages \* \* \*. Under this proposition \* \* \* specialists in treating a patient professionally might do or omit to do some act the doing or omission of which would constitute malpractice \* \* \* on his part which would not even be deemed negligence on the part of the average, ordinary physician or surgeon in the same community. \* \* \* We do not believe it can be seriously contended that such is the law of this State."

Furthermore, Dr. Loutfy did not attempt to hold Dr. Hiatt to the standards of a specialist in internal medicine.

We therefore conclude that the entire contention is without merit and that the plaintiff's expert was competent to testify as such.

## V

This brings us to Dr. Hiatt's contention that the plaintiff failed to prove that the loss of her leg was proximately caused by his negligence.

We have reviewed the testimony on this issue and conclude, as the trial court specifically ruled, that the testimony of the defendant and Dr. Loutfy was sufficient to allow the case to go to the jury.

Dr. Hiatt's contention is, in substance, that the loss of the leg was due to an occlusion of the arterial blood supply. It was his own testimony that, on each occasion he examined the plaintiff, the tibial artery was palpitating, the temperature of the toes was good and, in his opinion, she had circulation in her foot adequate to cure the ulcer. This demonstrates that the artery was still open. Add to this Dr. Loutfy's testimony that, under such a state of facts, with proper care and treatment the limb very definitely could have been saved, and the proof is adequate.

We conclude, therefore, that the testimony was sufficient to establish that the loss of the plaintiff's leg was proximately caused by Dr. Hiatt's negligence.

## VI

■■ This brings us to Dr. Hiatt's contention that the court erred in not giving four jury instructions tendered by him (No. 6 relating to reliance on the nursing staff, and Nos. 7, 8 and 9 relating to contributory negligence). The first instruction, on delegation to the nursing staff, was a modified version of IPI 105.04 and was unclear and would only have confused the jury. Further, the subject had been adequately covered by other instructions (proximate cause, standards of care, etc.). The court did not err in refusing this instruction. Dr. Hiatt also objects to the court's refusal to give instructions 7, 8 and 9 on contributory negligence (IPI 105.08, 10.03, and 11.01). As we have already indicated, the plaintiff was elderly and senile and none of the tendered instructions reflected this. We conclude that the court's refusal to give these instructions was not reversible error.

## VII

■■ This brings us to Dr. Hiatt's contention that the (unarticulated) finding that he was guilty of wilful and wanton conduct is contrary to and unsupported by the evidence.

In Sedgwick on Damages (9th ed. 1912), in section 363, at page 710, it is said:

> "§363. Exemplary damages are allowed only for wilful, wanton or aggravated wrong.
>
> The justification of exemplary damages lies in circumstances of aggravation; and the allowance of such damages is therefore restricted to such cases. There must usually be some wrong motive accompanying the wrongful act, and in the absence of malice or

some other circumstance of aggravation exemplary damages cannot be recovered in any form of action. * * *."

In 25A C.J.S. *Damages* (1965), it is said, in section 162(3), at page 81:
"§162(3).—*Exemplary or Punitive Damages.*

To warrant exemplary damages the evidence must show the aggravating circumstances justifying such damages; but an award of such damages may be based either on direct evidence of wrongful intent or on proper inferences from other evidence."

In McCormick on Damages (1935), it is said, in sections 77 and 79, pages 275-276, 280:

"THE BASIS FOR EXEMPLARY DAMAGES

77. The usual standards for measuring damages are compensatory, but the common law sanctions, in addition, the allowance, in a limited class of cases, of exemplary damages, sometimes called punitive or vindictive damages. They serve to give outlet, in cases of outrageous conduct, to the indignation of the jurors, and they are defended as furnishing a needed deterrent to wrongdoing, in addition to that furnished by criminal punishment.

The practice of awarding exemplary damages, known also as punitive damages and sometimes as "smart money," constitutes an exception to the rule that damages are aimed at compensation. Exemplary damages are assessed for the avowed purpose of visiting a punishment upon the defendant and not as a measure of any loss or detriment of the plaintiff. To many judges and commentators the doctrine which sanctions such punishment has seemed a discordant strain disturbing the harmonious symphony of the law of damages of which the central theme is compensation. Some of their more forcible criticisms may be mentioned. In the first place, it is alleged that to subject the defendant both to criminal prosecution and to punishment in the form of civil punitive damages for the same act (usually an act which is criminally punishable) exposes the defendant to "double jeopardy" in violation of the spirit, if not the letter, of the constitutional prohibitions against punishing a man twice for the same offense. Similarly, it is objected that the jury is permitted to assess a punishment under a procedure which deprives the person punished of the safeguards traditionally regarded as necessary, in criminal trials, such as the rule which requires the wrong to be established beyond a reasonable doubt, and that which exempts the accused from being forced to take the stand as a witness. Again, it is urged that, while fines in criminal cases are limited by statutes, exemplary damages are

limited only by the caprice of the jurors, subject to a review by the judges only in the rare cases where the judge can find impropriety of motive or gross disproportion, and that this want of a guiding measure leads to excess and injustice. Furthermore, it is suggested that it is basically unsound to award this amount which the defendant is condemned to pay as punishment to the plaintiff who has already been made whole by the actual damages. Finally, say the critics, the granting of exemplary damages is wholly unjustifiable upon any theory of the inadequacy of the measure of actual damages which, in a proper case, may include compensataion not merely for physical injury and money loss, but for pain, mental suffering, humiliation, indignity, and loss of reputation. It is probable that, in the framing of a model code of damages to-day for use in a country unhampered by legal tradition, the doctrine of exemplary damages would find no place.

＊ ＊ ＊

## DEFENDANT'S CONDUCT MUST HAVE BEEN WILLFUL OR WANTON

79. To subject a wrongdoer to liability for exemplary damages, it must be found that he acted with actual malice, ill will, or conscious disregard of consequences to others. Almost universally the decisions hold that mere "implied malice," which is attributed to any actionable conduct, does not suffice, nor does mere negligence."

Prosser, in The Law of Torts (4th ed. 1971), in section 2, pages 9-10, states:

"*Punitive Damages*

The idea of punishment, or of discouraging other offenses, usually does not enter into tort law, except in so far as it may lead the courts to weight the scales somewhat in favor of the plaintiff's interests in determining that a tort has been committed in the first place. In one rather anomalous respect, however, the ideas underlying the criminal law have invaded the field of torts. Where the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime, all but a few courts have permitted the jury to award in the tort action 'punitive' or 'exemplary' damages, or what is sometimes called 'smart money'. Such damages are given to the plaintiff over and above the full compensation for his injuries, for the purpose of punishing the defendant, of teaching him not to do it again, and of deterring others from following his example. Occasional

decisions have mentioned the additional purpose of reimbursing the plaintiff for elements of damage which are not legally compensable, such as his wounded feelings or the expenses of suit.

Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton. Lacking this element, there is general agreement that mere negligence is not enough, even though it is so extreme in degree as to be characterized as 'gross,' an unhappy term of ill-defined content, which occasionally, in a few jurisdictions, has been stretched to include the element of conscious indifference to consequences, and so to justify punitive damages. Still less, of course, can such damages be charged against one who acts under an innocent mistake in engaging in conduct that nevertheless constitutes a tort."

Morris, in *Punitive Damages in Tort Cases*, 44 Harv. L. Rev. 1173-1209 (1931), says, at page 1190:

"The 'rule of law' which is supposed to determine whether the case is an appropriate one for the allowance of punitive damages provides that they can be given only if it is found that the defendant has been 'reckless,' 'wanton,' 'oppressive,' 'wilful,' and the like.
\* \* \* ".

Very recently (1975), our Supreme Court, in *Mattyasovszky v. West Town Bus Co.*, 61 Ill.2d 31, 330 N.E.2d 509, speaking through Mr. Justice Schaefer, took occasion (in holding that punitive damages are not recoverable in actions for wrongful death), at pages 35-36, to say that:

"Historically, the practice of awarding punitive damages seems to have 'originated in the English courts in the eighteenth century as a means of justifying awards of damages in excess of the plaintiff's tangible harm.' (Note, Exemplary Damages in the Law of Torts, 70 Harv. L. Rev. 517, 518 (1957).) But it is unnecessary to pursue the possible historical origins in connection with this case, for it is generally recognized today that punitive damages are awarded primarily to punish the offender and to discourage other offenses. Restatement (Second) of Torts, sec. 908 (Tent. Draft No. 19, 1973); Prosser, Law of Torts 9 (4th ed. 1971).

The underlying strength of these objectives of punishment and deterrence varies substantially from case to case. Where, for example, the defendant has benefited by his misconduct, a judgment which only compensates the plaintiff for what he has lost would

permit the defendant to keep his wrongful gain. Apart from such cases, the situations in which punitive damages become an issue cover a broad spectrum that ranges from the intentional tort which is also a crime (see, *e.g., Knierim v. Izzo* (1961), 22 Ill.2d 73, 78), to what we characterize today as 'willful and wanton' conduct, a characterization that shades imperceptibly into simple negligence.

The objectives of an award of punitive damages are the same as those which motivate the criminal law—punishment and deterrence. Yet in a criminal case the conduct which gives rise to the imposition of punishment must be clearly defined. That is not so when the question is whether the conduct of the defendant can be characterized as either negligence or as willful and wanton conduct. The fine that is imposed upon the defendant in a criminal case goes to the State. But in a civil case the exaction taken from the defendant, under the label of exemplary damages, becomes a windfall for the plaintiff. The maximum and minimum amounts of the fine imposed by way of punishment and deterrence in a criminal case are fixed by statute. In the civil case, however, the jury is left at large to take from the defendant and deliver to the plaintiff such amount as it sees fit."

What, then, is "wilful and wanton" conduct?

In 74 Am.Jur.2d *Torts* (1974), it is said, in section 21, page 638, that:

"§21. Wilful, wanton, and reckless acts.

Tort liability may be based on wilful or wanton acts. A wilful act is one done intentionally, or on purpose, and not accidentally, and wilfulness implies intentional wrongdoing. An injury is wilful where the act which produced it was intended to have that effect. A wanton act is a wrongful act done on purpose or in malicious disregard of the rights of others."

And in 57 Am.Jur.2d *Negligence* §103, at 454 (1971), it is said that

"* * * Conduct to be wilful or wanton must be something more than negligence, since the term "negligence" is used to express a failure to exercise ordinary or due care, conduct when characterized by wilfulness rather than by inadvertence transcends negligence and is different in kind. Wanton misconduct is positive in nature, while mere negligence is materially negative."

In 25 C.J.S. *Damages* §123(4) (1966), it is said:

"§123(4).—What Constitutes Malice, Wantonness, or Willfulness Malice constituting the basis of an award for exemplary damages involves the doing of an act conceived in a spirit of mischief or criminal indifference to civil obligations, and may be either ex-

press or implied; to constitute wilfullness there must be an intent to do wrong; and wantonness implies a consciousness, without intent, that the conduct will probably result in injury."

We have carefully reviewed the evidence in this case, which is set out in considerable detail above and will not be repeated here, and conclude that it does not come within a country mile of supporting a finding that Dr. Hiatt was guilty of wilful and wanton conduct justifying a punitive award of $80,000. We do conclude that he left undone many things which he ought to have done and was guilty of negligence but not wilful and wanton.

Illinois courts of review have the power when, as here, a verdict is unsupported by and contrary to the manifest weight of the evidence, to set aside the verdict and reverse so much of the judgment as is based thereon.

In *Grinestaff v. New York Central R.R.* (1929), 253 Ill.App. 589, in reversing a judgment for the plaintiff, the court, at pages 608-609, said:

"What is the evidence of facts and circumstances proven in this case that brings appellant within the rule of having committed a wilful or wanton injury? No proofs of any kind are offered by appellee tending to show how or in what manner appellant's employees operated the engine, its speed or other directions, except witnesses testify that the whistle was not blown or the bell rung and the night was dark. * * * We find no proofs in this record which warrant the court in sustaining the verdict and judgment, based upon a wilful or wanton injury. The judgment is based upon the fifth count charging a wilful and wanton injury, as well as upon the other counts. That constitutes error. The court should have withdrawn the fifth count from the consideration of the jury. We hold under the proofs submitted that appellee did not establish a cause of action on the fifth count.

In *Provenzano v. Illinois Central R.R. Co.* (1934), 357 Ill. 192, 191 N.E. 287, in reversing a judgment for the plaintiff, the court, at pages 195-196, said:

"In order to constitute willful and wanton misconduct the injury must either have been intentionally inflicted, or produced by acts so grossly negligent as to exhibit a reckless disregard for the safety of others. (*Brown v. Illinois Terminal Co.* 319 Ill. 326.) The only evidence for the plaintiff tending to show negligence on the part of the defendant was to the effect that some of the witnesses did not hear a bell or whistle, and evidence tending to show that the speed of the train was something between forty-five and sixty miles per hour. The testimony of the witnesses to the effect that

they heard no bell or whistle was merely negative in its character and did not tend to raise an issue of fact as to whether or not the whistle was blown or the bell rung. (*Morgan v. New York Central Railroad Co.* 327 Ill. 339.) However, even if it be taken as true that no bell was rung or whistle sounded, it would be nothing more than an act of negligence. The same is true as to the speed at which the train was running, even if it be assumed at the highest estimate of sixty miles per hour. * * * There being no evidence showing or tending to show that the defendant willfully or intentionally injured the plaintiff and no evidence of any circumstances exhibiting a reckless disregard for his safety, there should have been a directed verdict as to the third count of the declaration."

And in *Miles v. American Steel Foundries* (1939), 302 Ill.App. 262, 23 N.E.2d 754, in reversing a judgment for the plaintiff, the court, at page 267, said:

"As to the first of the additional counts, which is numbered four, plaintiff has undertaken to show that because there was no whistle blown and bell rung in accordance with the statute in proper cases, that there was an act of wilful and wanton negligence on the part of the defendant. This statute is wholly inapplicable to a condition such as existed in this case, and even if it were applicable our Supreme Court held in *Provenzano v. Illinois Cent. R. Co.*, 357 Ill. 192 that even in case where the statute is applicable failure to ring the bell or blow the whistle would be nothing more than an act of negligence."

We therefore conclude, as we have said, that the (unarticulated) finding of the jury that Dr. Hiatt was guilty of wilful and wanton conduct is unsupported by and contrary to the manifest weight of the evidence and reverse so much of the judgment ($80,000) as consists of "punitive damages."

## VIII

This brings us to the plaintiff's cross-appeal, in which she contends that the trial court erred in directing out the Home and Genetske and in entering judgment for those defendants.

Where all of the evidence, viewed in its aspect most favorable to the party opposing the motion for a directed verdict, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand, then the motion should be granted and the verdict directed. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill.2d 494, 510, 229 N.E.2d 504.

Here the trial court directed a verdict for the Home and Genetske on the grounds (1) that the evidence did not establish a violation of the standards applicable to convalescent homes; and (2) that, even had a technical violation been established, it had not been established that such violation proximately caused the loss of the plaintiff's leg.

The proprietors of a convalescent home, somewhat like those of a private hospital, are under a duty to exercise reasonable care to avoid injury to patrons, and the reasonableness of such care is to be assessed in the light of the patron's physical and mental condition. (40 Am.Jur.2d *Hospitals and Asylums* §36 (1968).) Certainly a hospital is required "to conform to the legal standard of reasonable conduct in the light of the apparent risk." *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill.2d 326, 331, 211 N.E.2d 253, quoting Prosser on Torts 331 (3rd ed. 1971).

■■ In malpractice cases, the courts have held that, except in the so-called "common knowledge" or "gross negligence" situations, expert testimony is essential to the proof of the standard of professional care against which due care must be measured. (*Ohligschlager v. Proctor Community Hospital* (1973), 55 Ill.2d 411, 417, 303 N.E.2d 392; *Lundahl v. Rockford Memorial Hospital Association* (1968), 93 Ill.App.2d 461, 464-465, 235 N.E.2d 671; *Graham v. St. Luke's Hospital* (1964), 46 Ill.App.2d 147, 196 N.E.2d 355.) Likewise in a suit against a physician, expert testimony is ordinarily required to establish that the injuries suffered by the plaintiff were a result of that want of skill or negligence. *Lundahl v. Rockford Memorial Hospital Association* (1968), 93 Ill.App.2d 461, 464-465, 235 N.E.2d 671.

■■ We agree that the fact that the nursing care given was "usual" or customary would not of itself preclude the possibility of negligence. (*Lundahl v. Rockford Memorial Hospital Association* (1968), 93 Ill.App. 2d 461, 465, 235 N.E.2d 671.) It is entirely possible, as was pointed out by the Supreme Court in *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill.2d 326, 331-332, 211 N.E.2d 253, that what is usual and customary may itself be negligence.

The Regulations of the Illinois Department of Public Health, "Minimum Standards, Rules and Regulations for Classification and Licensure of Long-Term Care Facilities by Levels of Service" were introduced into evidence by the plaintiff. They require up-to-date patient care program for each resident, this plan to be reviewed and modified in keeping with the care needed as indicated by the resident's condition. The nursing home must notify the resident's family immediately, if possible, of anything unusual happening to the resident such as a sudden illness or disease. The evidence tends to show that these regulations were not fully

complied with in this case. However, there was no evidence that these violations caused Mrs. Stogsdill to lose her leg. Neither her son nor her daughter testified that they relied upon the nursing home to notify them that their mother had gangrene or that if they had been so notified they would have obtained another physician or transferred her to the hospital any earlier than they did. They visited her during the months in question; they were aware that the sore was getting larger and that she complained of being in pain. While this court is aware of the horror with which gangrene is regarded by the general population, it would be pure speculation to decide that these two people would have acted any differently had they been informed their mother had gangrene either at the time Mrs. Watts first observed it or at the time she first smelled it. And it can hardly be described as a "sudden" illness or disease.

The aforementioned regulations also require the home to have written patient care policies formulated with the involvement of the administrator and the advisory physician including provisions as to which patients will be transferred. The written program of medical services must include the entire complex of services provided by the facility and the arrangements for effecting transfer to other facilities as promptly as needed. No resident who is determined by professional evaluation to be in need of skilled nursing care shall be kept in an intermediate care facility. The Director of Nursing is required to participate in the development and implementation of patient care policies and to bring patient care problems requiring changes in policy to the attention of the facility's policy development group. She is also required to participate in the screening of prospective residents and their placement in terms of the nursing competencies available. In addition she has the responsibility for the planning of the up-to-date patient care plan already mentioned. She is also responsible, obviously, for directing the activities of the nursing service personnel. Nursing care includes, but is not limited to, the carrying out of treatments, supervision of special diets, objective observation of changes in a resident's condition, including mental and emotional changes, as a means for analyzing and determining the care required and/or the need for further medical evaluation and treatment, a regular program to prevent and treat decubiti, and kind and considerate treatment. Indeed, the license of the facility may be revoked for cruelty to a resident or indifference to a resident's health, safety or welfare, which includes the failure to provide a resident with the care and supervision he requires. An intermediate care facility, which this is, is required to have an advisory physician who is responsible for advising the administration and licensee on the overall medical management of the residents. Each resident shall be permitted his choice of a physician. The facility

must notify the physician of any accident, injury or unusual change in a resident's condition.

These last regulations, while introduced into evidence by the plaintiff, were not, with the exception of that pertaining to the patient care plan, argued to the trial judge in oppositon to the motion for a directed verdict, or raised in motion for a new trial. Moreover these requirements are too vague to be sufficient indicators of the standard of due care required of nursing homes by themselves. For example, assuming that Mrs. Stogsdill needed skilled nursing care and thus should not have been retained in the Manor Convalescent Home, who is to make that determination? The regulation merely says, "professional evaluation." Does this mean the evaluation of the Director of Nursing, who does have some responsibility for screening residents and in planning an up-to-date patient care plan, or does it mean the evaluation of a physician. Dr. Hiatt apparently always believed Mrs. Stogsdill received sufficient care at the Manor. Moreover, while the regulations require the nursing home to notify the physician in case of illness, it is not clear whether this means the facility's own physician or the patient's. Thus no duty can be said to have been created by this regulation requiring the notification of the advisory physician where the patient's own physician has been notified of the situation. Likewise, while the regulations state that nursing care includes objective observation of changes in a resident's condition, as a means for analyzing and determining the care required or the need for further medical evaluation and treatment, there is no express requirement in the regulations that the facility consult another physician if the resident already has a personal physician. It must be remembered that this is a nursing home and not a hospital. It may be that what would be negligence in a hospital because of its greater control over physicians and its more extensive facilities would not be negligence in a nursing home. Since the regulations do not clearly set forth the standard of care required, expert testimony was still required in this case.

The only expert testimony introduced in this case as to the negligence of the nursing home was that of Dr. Loutfy. While he did state that the nurses did not "really do the full right thing," his concern seemed to be directed towards the delay in August in first calling Dr. Hiatt. Dr. Loutfy testified that a nurse has the responsibility to describe to the physician what she sees, to try to inform him of what the condition is but that she should not carry on the treatment unless it is specifically ordered by the physician. In addition, he stated that there is a difference in the level of care in a nursing home and in a hospital. The hospital has the laboratory, has the higher standard of treatment and follow-up, capacity of testing and evaluation of the patient in detail.

Accordingly there was no evidence introduced, expert or otherwise, that the Manor here should have second-guessed Dr. Hiatt's treatment and have sought treatment for her elsewhere. In general, treatment is a medical question entirely within the discretion of the treating physician, not the hospital, especially where the doctor is privately employed, as here. *Lundahl v. Rockford Memorial Hospital Association* (1968), 93 Ill.App.2d 461, 466-467, 235 N.E.2d 671, where the court, at page 466, said:

> "The plaintiffs cite the Darling case (ibid.) in support of their contention that the hospital was negligent in its failure to require consultation between Dr. Paynter and the members of its staff. In the Darling case, however, the treating physician was an employee placed by the hospital on emergency duty and subject to its supervision. Dr. Paynter was not employed by the hospital, was not an agent of it and not subject to its supervision."

For the same reason, the Manor is not liable for the pain endured by Mrs. Stogsdill during the three months. If the medication was improperly insufficient, that was the responsibility of Dr. Hiatt, and not of the Manor.

In addition to the requirement in the regulations that notice be given "the physician," there was testimony by Dr. Loutfy that a nurse should inform the physician what the patient's condition is. However, there is no evidence that Dr. Hiatt would have acted any differently had he been more closely informed. After he was notified in August, Dr. Hiatt visited Mrs. Stogsdill at least once a month and had the opportunity while there to read the medical records. Thus he was kept fully informed of her progress. Nor was there any evidence that the Manor's failure to notify Dr. Hiatt immediately when the ulcer first developed, even if improper, caused the eventual amputation of the leg.

■■ We are in agreement with the trial court that the plaintiff failed to introduce any proof to substantiate several essential elements in her case against the Manor Convalescent Home and Mrs. Genetske and therefore affirm the directed verdict and judgment rendered for said defendants. As a result, we reverse so much of the judgment ($80,000) against Dr. Hiatt as consists of punitive damages but in all other respects, the judgment is affirmed.

Reversed in part, affirmed in part.

GUILD, P. J., and SEIDENFELD, J., concur.