(No. 56904.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant and Cross-Appellee, v. MYRON GURELL *et al.,* Appellees and Cross-Appellants.

*Opinion filed October 4, 1983.—Rehearing denied December 2, 1983.*

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Michael B. Weinstein, Assistant Attorney General, and Glenn E. Carr, Michael Kreloff, Stuart Sikes, and Lynn Worley, Assistant State's Attorneys, of counsel), for the People.

John W. Cooley, of Stone, McGuire & Benjamin, and Judith Schwartz Sherwin, of Gutstein & Schwartz, all of Chicago, for appellees and cross-appellants.

Greg McHugh, of River Forest, and Kathy Swanson, of Evanston, for *amicus curiae* Illinois Citizens for Better Care.

CHIEF JUSTICE RYAN delivered the opinion of the court:

This case involves a criminal prosecution initiated pursuant to the Nursing Home Care Reform Act of 1979 (Ill. Rev. Stat. 1979, ch. 111½, par. 4151—101 *et seq.*). Early in 1981, defendants were partners in the operation of the Mill View Nursing Center. They were charged in the circuit court of Cook County with certain violations of the Act. The court held the Act and regulations promulgated thereunder unconstitutional. The State appealed directly to this court. 87 Ill. 2d R. 603.

Pursuant to the Act, the Illinois Department of Public Health is required to license and certify facilities such as Mill View. (Ill. Rev. Stat. 1979, ch. 111½, par. 4153—

101.) To carry out these regulatory functions the Department is authorized to prescribe minimum standards for these facilities by way of Department rules and regulations. Ill. Rev. Stat. 1979, ch. 111½, par. 4153—202.

Sections 1—129, 1—130 and 1—131 of the Act (Ill. Rev. Stat. 1979, ch. 111½, pars. 4151—129, 4151—130, 4151—131) define three classes of violations—type A, type B and type C.

Section 1—129 provides:

"A 'Type "A" violation' means a violation of this Act or of the rules promulgated thereunder which creates a condition or occurrence relating to the operation and maintenance of a facility presenting a substantial probability that death or serious mental or physical harm to a resident will result therefrom. (Ill. Rev. Stat. 1979, ch. 111½, par. 4151—129.)

Section 1—130 defines a type B violation as follows:

"A 'Type "B" violation' means a violation of this Act or of the rules promulgated thereunder which creates a condition or occurrence relating to the operation and maintenance of a facility directly threatening to the health, safety or welfare of a resident." (Ill. Rev. Stat. 1979, ch. 111½, par. 4151—130.)

Section 1—131 defines a type C violation as follows:

"A 'Type "C" violation' means a violation of this Act or of the rules promulgated thereunder which creates a condition or occurrence relating to the operation and maintenance of a facility which indirectly threatens the health, safety or welfare of a resident." (Ill. Rev. Stat. 1979, ch. 111½, par. 4151—131.)

Section 3—305 (Ill. Rev. Stat. 1979, ch. 111½, par. 4153—305) provides civil penalties for a violation of the Act or any rule adopted thereunder.

In addition to the civil penalties, section 3—318 (Ill. Rev. Stat. 1979, ch. 111½, par. 4153—318) provides that no person shall "[i]ntentionally fail to correct or interfere with the correction of a Type 'A' or Type 'B' violation within the time specified on the notice or approved plan of

correction" and provides that a violation of this section constitutes a Class A misdemeanor.

Early in 1981, pursuant to section 3—301 of the Act (Ill. Rev. Stat. 1979, ch. 111½, par. 4153—301), the Department gave notice to the Mill View facility that it was in violation of numerous Department regulations, including the following:

> "The facility shall have written policies and procedures, governing all services provided by the facility which shall be formulated by a Resident Care Policy Committee consisting of at least the administrator, the advisory physician or the medical advisory committee and representatives of nursing and other services in the facility. These policies shall be in compliance with the Act and all rules promulgated thereunder. These written policies shall be followed in operating the facility and shall be reviewed at least annually by this committee, as evidenced by written, signed and dated minutes of such a meeting. (B, C)"

> "All medications shall be administered *only* by licensed medical or licensed nursing personnel in accordance with their respective licensing requirements. They shall be administered as soon as possible after doses are prepared and administered by the same person who prepared the doses for administration, except under single unit dose packaged distribution systems. Each dose administered shall be properly recorded in the clinical record by the person who administers the doses. (See 09.01.04.00) (A, B)"

> "Medically prescribed diets shall be recorded in the resident's medical record and served as ordered. The resident shall be observed to determine acceptance of the diet and these observations shall be recorded in his record. (B, C)"

The designations of A, B or C in parentheses following each regulation indicate the class of violation that may apply to the particular regulation.

Inasmuch as the trial court disposed of this case on the pretrial motion, and no evidence was taken, we do not

have a detailed picture of the facts involved.

On August 11, 1981, six charges were filed against the defendants, each of whom was a general partner in Mill View Associates, the operator of the Mill View Nursing Home facility. In four counts, the defendants are charged with having on April 28, 1982, April 29, 1982, June 15, 1981, and June 27, 1981, committed the offense of failure to correct violations in that they intentionally failed to correct the type B violation of "unlicensed personnel administering medication and performing medical procedures," within the time specified in a report of correction. A fifth count charged that on or about March 3, 1981, through July 1, 1981, defendants committed the offense of failure to correct violations in that they intentionally failed to correct a type B violation of "failure to record observations of resident's acceptance of medically prescribed diets in the resident's clinical records" within the time specified in a report of correction. A sixth charge alleged that on or about July 1, 1981, defendants committed the offense of failure to correct violations in that they intentionally failed to correct the type B violation of "failure to document that a resident care policy in the facility had been reviewed annually by a resident care policy committee" within the time specified in the approved plan of correction. These criminal charges stem from alleged violations of the three regulations quoted above.

In a pretrial motion the defendants moved to quash the misdemeanor complaints, alleging that the Nursing Home Care Reform Act of 1979 and the regulations were unconstitutional.

Section 1—113 of the Act (Ill. Rev. Stat. 1979, ch. 111½, par. 4151—113) exempts from the operation of the Act a home, institution or other place operated by the Federal government or agency thereof, or by the State of Illinois. The defendants challenged the constitutionality of the statute and rules and regulations on several grounds. The

court granted the motion to quash, holding that the provision of section 1—113 of the Act excluding from its operation facilities operated by the State violated the equal protection clause of the fourteenth amendment. The court also held that the fact that the same violations of the rules and regulations of the Department could be both a civil violation and a criminal violation rendered the rules vague, in violation of the fourteenth amendment. As to the other constitutional challenges to the statute and to the rules and regulations, the court held against the defendants, and found that the statute and the rules and regulations were not constitutionally invalid in those respects.

The defendants have cross-appealed and have again raised those constitutional challenges in this court. They will be considered later in this opinion. The State has appealed from the trial court's order holding that the statute violated the equal protection clause and that the rules and regulations were unconstitutionally vague.

We first consider the validity of the exemption of State-operated facilities from regulation by the Act under section 1—113 (Ill. Rev. Stat. 1979, ch. 111½, par. 4151—113). The trial court held this to be a violation of the equal protection clause of the fourteenth amendment of the United States Constitution.

In considering this question, we must first define the proper test to be applied to the challenged legislation. The defendants argue that we are dealing with a fundamental right, and argue that the statute therefore must meet strict judicial scrutiny and a compelling State interest for the exemption must be shown. The People, on the other hand, claim that the statute in question governs economic rights, does not involve a fundamental right, and need only have a rational relationship to a legitimate State purpose to be upheld, thus meeting the so-called minimum-scrutiny test.

Defendants cite *San Antonio Independent School Dis-*

*trict v. Rodriguez* (1972), 411 U.S. 1, 36 L. Ed. 16, 93 S. Ct. 1278, for the proposition that strict judicial scrutiny and the need for compelling State interests are appropriate tests when a fundamental right is impaired by State legislation. This, of course, is a recognized principle of law. However, we are not in this case dealing with a fundamental right. In *Rodriguez* it was argued that the right to an education was a fundamental right, which required the application of the strict-scrutiny test. The Supreme Court in *Rodriguez* reviewed several of its decisions where similar contentions had been made and stated, "[I]t is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws. Thus, the key to discovering whether education is 'fundamental' is not to be found in comparisons of the relative societal significance of education as opposed to subsistence or housing. Nor is it to be found by weighing whether education is as important as the right to travel. Rather, the answer lies in assessing whether there is a right to education *explicitly or implicitly guaranteed by the Constitution.*" (Emphasis added.) (411 U.S. 1, 33-34, 36 L. Ed. 2d 16, 43, 93 S. Ct. 1278, 1297.) Although the right to engage in a chosen occupation or profession is a significant right, it does not require the application of the strict-scrutiny test. The court, in *Rodriguez,* evidenced an unwillingness to expand the class of "fundamental rights" previously recognized. No case has been called to our attention in which the right to economic gain or the right to carry on one's business or profession has been held to be a fundamental right guaranteed by the Constitution. The proper test to be applied in making an equal protection determination therefore is not strict scrutiny. In determining whether the statute under consideration is valid, it need have only a rational relationship to a legitimate State purpose to be upheld.

A statute is presumed valid, and the burden is on the

party challenging its validity to prove that it is unconstitutional. (See *Scott v. Department of Commerce & Community Affairs* (1981), 84 Ill. 2d 42, 50.) It is the defendants' position that the exemption of facilities operated by the State from the operation of the statute has no rational basis. We do not agree. In *Friedman & Rochester, Ltd. v. Walsh* (1977), 67 Ill. 2d 413, this court stated:

> "The equal protection clauses of the State and Federal constitutions do not prohibit the legislature from pursuing a reform 'one step at a time,' or from applying a remedy to one selected phase of a field while neglecting the others. (*Williamson v. Lee Optical of Oklahoma, Inc.* (1955), 348 U.S. 483, 489, 99 L. Ed. 563, 573, 75 S. Ct. 461; *Illinois Coal Operators Association v. Pollution Control Board* (1974), 59 Ill. 2d 305, 312-13.) As the United States Supreme Court has stated, 'a legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked.' (*McDonald v. Board of Election Commissioners* (1969), 394 U.S. 802, 809, 22 L. Ed. 2d 739, 746, 89 S. Ct. 1404)." (*Friedman & Rochester, Ltd. v. Walsh* (1977), 67 Ill. 2d 413, 421-22.)

In our case the legislature chose to deal with the problems it perceived in the nursing-home industry one step at a time by regulating private facilities. Legislative classifications need not be faultless. The State need only have a reasonable basis for the classification. (*Dandridge v. Williams* (1970), 397 U.S. 471, 485, 25 L. Ed. 2d 491, 501-02, 90 S. Ct. 1153, 1161; *New Orleans v. Dukes* (1976), 427 U.S. 297, 302, 49 L.Ed. 2d 511, 517, 96 S. Ct. 2513, 2515.) The State has pointed out in its brief that State-operated facilities are under the direct control of the State and that most of these facilities are regulated by statutes other than the one in question. Thus, whereas the State has no means of controlling the operation of privately owned facilities other than through the statute in question, it does have direct control over the operation of State-owned facilities without

the aid of the statute now under consideration. The urgent need of the legislation would properly be perceived by the legislature to be in the private nursing home area and not in the area of institutions operated by the State. There exists, therefore, a rational basis for focusing the application of this statute on privately owned and operated nursing homes and attacking the problem first in that area, where the legislature perceived the greatest need to be. The defendants have not shown a violation of the equal protection clause of the State or Federal constitutions.

The defendants in this court assert that the exemption of State-operated facilities from the operation of the statute constitutes special legislation in violation of section 13 of article IV of the Illinois Constitution. This court has held that the standards used in determining an equal protection challenge are to be utilized in determining a challenge to the statute under the special legislation provisions of our constitution. We held above that the legislation has a rational relationship to a legitimate State purpose. The different treatment accorded State-operated facilities does not therefore constitute special legislation. See *Illinois Housing Development Authority v. Van Meter* (1980), 82 Ill. 2d 116, 124; *Anderson v. Wagner* (1979), 79 Ill. 2d 295, 314; *S. Bloom, Inc. v. Mahin* (1975), 61 Ill. 2d 70, 76-77.

The trial court stated that it did not find that section 3—318(a) of the Act (Ill. Rev. Stat. 1979, ch. 111½, par. 4153—318(a)), the section defining the crimes under the Act, was vague. The court also stated that it did not find sections 1—129 and 1—130 vague (the definition of types A and B violations). The court also found that there had not been an unlawful delegation of authority by the legislature to the Department. The court found, however, that the rules and regulations of the Department were vague, taking into consideration that the same violation can be a civil violation and a criminal violation. The court specifically found the rules and regulations valid in other respects. We

must, therefore, consider whether the rules and regulations are so vague as to violate due process.

A statute or a regulation is unconstitutionally vague and violates due process when a person of ordinary intellect cannot readily ascertain its meaning. A criminal statute violates due process when it does not impart sufficient notice as to what conduct is forbidden.

Impossible standards of specificity, however, are not required. (*People ex rel. Difanis v. Barr* (1980), 83 Ill. 2d 191, 205.) The due process clauses of the Illinois and Federal constitutions are not violated if the duty imposed by the statute is described in sufficiently definite terms to serve as a guide to those who must comply with it. (*Scott v. Department of Commerce & Community Affairs* (1981), 84 Ill. 2d 42, 50.) In *Schiller Park Colonial Inn, Inc. v. Berz* (1976), 63 Ill. 2d 499, 513, this court stated:

> "A statute is not rendered unconstitutionally vague, however, merely because the imagination can conjure up hypothetical situations in which the meaning of some terms may be in question."

The trial court's primary concern with the regulations was that a violation of a regulation may subject the violator to both a civil and a criminal penalty. We find that this possibility does not render the regulations vague for the reasons discussed herein. Sections 1—129, 1—130 and 1—131 of the Act set out earlier in this opinion define the nature of the conduct that may constitute type A, B and C violations. A type A violation creates a "substantial probability that death or serious mental or physical harm to a resident will result therefrom." A type B violation creates a condition "directly threatening to the health, safety or welfare of a resident." A type C violation creates a condition which "indirectly threatens the health, safety or welfare of a resident." The regulations flesh out the general nature of the violations defined in these sections by setting out specific conditions or conduct deemed to constitute violations and after each regulation the specific type of viola-

tion (A, B or C) that such condition or conduct may constitute. Each regulation has after it multiple designations such as "A, B" or "B, C." It is not these multiple designations that the trial court held rendered the regulations vague, and we find that such multiple designations do not make the regulations unconstitutionally vague. Varying degrees of the conditions or conduct proscribed by the regulations may justify a greater or lesser penalty. Also, as noted below, if the operator of the facility questions the designation of the type of violation, a hearing and review of the administrative decision by the court may be had. Although the same conditions may form the basis for both a civil and criminal penalty under the Act, they do not constitute both a civil and a criminal violation. The Act provides for notice by the Department to the facility of a violation. (Ill. Rev. Stat. 1979, ch. 111½, par. 4153—301.) The facility is entitled to have a review of the Department's decision (Ill. Rev. Stat. 1979, ch. 111½, par. 4153—703), and the administrative decision on review may be reviewed by the circuit court under the Administrative Review Act (Ill. Rev. Stat. 1979, ch. 111½, par. 4153—713). After having received notice of the violation under the statute, the operator of a facility has a duty to abate or eliminate the violation or, in cases involving type B or C violations, to submit a plan of correction to the Department. (Ill. Rev. Stat. 1979, ch. 111½, par. 4153—303.) Civil penalties may be imposed for the original violation. (Ill. Rev. Stat. 1979, ch. 111½, par. 4153—305.) However, criminal penalties are not imposed for the original violation. So far as is relevant to this case, the Act provides that criminal penalties may be imposed only for the intentional failure to correct a type A or type B violation within the time specified in the notice, or approved plan of correction. (Ill. Rev. Stat. 1979, ch. 111½, par. 4153—318.) Thus, although the violation of the regulation may form the basis for both a civil and a criminal penalty, only the civil penalty may be imposed for the

original violation, whereas the criminal penalty under the Act is imposed only for an intentional failure to correct the original violation within the time specified after notice of the violation and the time within which correction must be made has been given to the facility.

Contrary to the defendants' contention, the Act is very specific as to what conduct constitutes the criminal offense—intentional failure to correct the type A or B violation specified in the notice given to the facility. If there were any question as to whether the conduct specified in the notice constitutes a violation of the Act or the regulations or whether the conduct constitutes a type A, B or C violation, the Act provides for a hearing and judicial review of the Department's decision in this regard. In this case the defendants were given notice of the violations, all of which were type "B" violations. Certain time periods were specified within which the violations were to be corrected. The defendants are charged with intentionally failing to correct the type B violations within the time periods. We do not find the total scheme of the Act, as implemented by the rules and regulations, to be vague or that it constitutes a violation of due process.

Defendants also raise a factual challenge to the criminal proceeding and claim that they were not given proper notice of the Department's rejection of their plan of correction or an opportunity to file a modified plan pursuant to the Act. This case is here only on the pleadings and following the trial court's determination that the Act was unconstitutional. Defendants' contention does not involve a constitutional question. If the defendants were not given an opportunity to exercise those rights provided in the Act, this is a matter that can be raised in the trial court on remand.

Defendants, by way of cross-appeal, have raised several issues on which the trial court had ruled adversely to their position. The defendants first claim that the Act consti-

tutes an unlawful delegation of legislative authority to the Department. The question of unlawful delegation is intertwined with the question of vagueness as it relates to due process, which we have just discussed. To satisfy the due process requirement, an act shall not be vague, indefinite or uncertain and must provide sufficient standards to guide the administrative body in the exercise of its functions. (*Polyvend, Inc. v. Puckorius* (1979), 77 Ill. 2d 287, 299.) In addressing the delegation of authority question, this court has stated:

> "Absolute criteria whereby every detail necessary in the enforcement of a law is anticipated need not be established by the General Assembly. The constitution merely requires that intelligible standards be set to guide the agency charged with enforcement ***." *Hill v. Relyea* (1966), 34 Ill. 2d 552, 555.

Thus, adequate standards must be contained in the Act to satisfy both the due process requirement and the delegation-of-legislative-authority requirement. The adequacy of the standards, however, is not necessarily determined in both situations by the same tests. See *Polyvend, Inc. v. Puckorius* (1979), 77 Ill. 2d 287, 299-300.

This court has stated many times that the General Assembly cannot delegate its general legislative authority to determine what the law is; however, it may delegate the authority to execute the law and to do those things which the legislature might properly do but cannot do as understandingly or advantageously. See *Hill v. Relyea* (1966), 34 Ill. 2d 552, 555.

This court, in *Stofer v. Motor Vehicle Casualty Co.* (1977), 68 Ill. 2d 361, after reviewing previous decisions of this court, stated:

> "Accordingly, we find that the view which has developed through the decisions of this court in recent years requires that the legislature, in delegating its authority provide sufficient identification of the following:
>
> (1) The *persons* and *activities* potentially subject

to regulation;

(2) the *harm* sought to be prevented; and

(3) the general *means* intended to be available to the administrator to prevent the identified harm." (*Stofer v. Motor Vehicle Casualty Co.* (1977), 68 Ill. 2d 361, 372.)

The Act necessarily delegates considerable authority to the Department to promulgate regulations and to enforce both the regulations and the Act. However, under the tests set out in *Stofer*, we find that the Act contains adequate guidelines. The persons and activities subject to the Act involve the operation of long-term-care facilities with the exception noted in the Act. (Ill. Rev. Stat. 1979, ch. 111½, par. 4151—113.) The harm sought to be prevented is evident from the definitions of types A, B and C violations to which we have previously referred. (Ill. Rev. Stat. 1979, ch. 111½, pars. 4151—129, 4151—130, 4151—131.) The means available to the Department to prevent the harm are spelled out in the Act and include licensing (Ill. Rev. Stat. 1979, ch. 111½, par. 4153—101 *et seq.*) and both civil and criminal penalties (Ill. Rev. Stat. 1979, ch. 111½, pars. 4153—301 *et seq.*, 4153—318). The standards set forth in the Act are sufficient. More specific direction to the Department would simply add needless detail.

Defendants contend that the Act and rules and regulations constitute an *ex post facto* law in violation of the fourteenth amendment. The basis for this contention is found in the argument that the Act does not define the crimes and thus the definition of what constitutes an offense under the Act is left to those who administer it. This argument loses sight of the fact that the conduct that constitutes the crime under the Act, as we have previously stated, is not a violation of the rules or regulations but is a failure to correct the violation after it has been determined that such a violation exists and notice has been given to the facility. Assuming that, because of inadequate standards, definition of a violation is left to those who adminis-

ter the Act, this still does not constitute an *ex post facto* law, because the conduct that will constitute the offense is stated and defined at the time that notice of the violation is given. The conduct that constitutes the criminal violation (intentional failure to correct the violation) necessarily occurs after the offense has been defined. (See *Stein v. Howlett* (1972), 52 Ill. 2d 570, 584.) We see no merit in the *ex post facto* contention.

Defendants next argue that the Act constitutes a bill of attainder. An essential requirement of a bill of attainder is that it be a legislative act which inflicts punishment without a judicial trial. (See *Polyvend v. Puckorius* (1979), 77 Ill. 2d 287, 301.) The statute we now consider clearly provides for a judicial determination of the criminal charges against defendants. (Ill. Rev. Stat. 1979, ch. 111½, pars. 4153—318(b), (c).) As to civil penalties that may be assessed by the Department, the Act likewise provides that the defendants are entitled to a hearing. (Ill. Rev. Stat. 1979, ch. 111½, pars. 4153—307, 4153—703 through 4153—712.) The defendants focus on only one aspect of the accepted definition of a bill of attainder. In *United States v. Lovett* (1946), 328 U.S. 303, 315, 90 L. Ed. 1252, 1259, 66 S. Ct. 1073, 1079, the court stated that previous decisions of that court stand for the proposition that "legislative acts *** *that apply either to named individuals or to easily ascertainable members of a group* in such a way as to inflict punishment on them without a judicial trial are bills of attainder ***.*" (Emphasis added.) The defendants contend that the legislature, in the Act in question, narrowly focused not on health-care providers in general, but on the privately owned nursing homes. Thus, it is only on the italicized portion of the definition of a bill of attainder that the defendants focus and not on the judicial-trial aspect. We have indicated above that the Act does not inflict punishment without a judicial trial.

In *Nixon v. Administrator of General Services* (1977),

433 U.S. 425, 53 L. Ed. 2d 867, 97 S. Ct. 2777, the court stated:

"Appellant's characterization of the meaning of a bill of attainder obviously proves far too much. By arguing that an individual or defined group is attainted whenever he or it is compelled to bear burdens which the individual or group dislikes, appellant removes the anchor that ties the bill of attainder guarantee to realistic conceptions of classification and punishment. His view would cripple the very process of legislating, for any individual or group that is made the subject of adverse legislation can complain that the lawmakers could and should have defined the relevant affected class at a greater level of generality. Furthermore, every person or group made subject to legislation which he or it finds burdensome may subjectively feel, and can complain, that he or it is being subjected to unwarranted punishment. [Citation.] However expansive the prohibition against bills of attainder, it surely was not intended to serve as a variant of the equal protection doctrine, invalidating every Act of Congress or the States that legislatively burdens some persons or groups but not all other plausible individuals." *Nixon v. Administrator of General Services* (1977), 433 U.S. 425, 470-71, 53 L.Ed. 2d 867, 908-09, 97 S. Ct. 2777, 2804.

It appears from the defendants' contention that they are here using the bill-of-attainder argument as a variant of the equal protection argument we have heretofore addressed. Since we have found that the Act does not violate the equal protection clause and, as we have indicated, the Act provides for judicial determination, we find no merit in the bill-of-attainder argument.

Finally, defendants claim that the Act and Department regulations violate due process because they unreasonably limit the right to private employment and the right to engage in a chosen profession. Over 30 years ago this court dealt with a similar issue in *Klein v. Department of Registration & Education* (1952), 412 Ill. 75, where the court stated:

"The right to pursue a trade or calling is, however, sub-

ordinate to the right of the State to limit such freedom of action where the public health, safety or welfare may require. [Citations.] In instances where the police power is invoked to regulate and supervise a legitimate occupation, the restraint imposed must be reasonable. The legislative determination that regulations are needful is not conclusive and is always subject to review. In order for such regulations to be lawfully imposed upon the constitutional rights of the individual to pursue his trade, profession or business, the act passed under the guise of a measure to protect the public health, safety and welfare must have a definite relation to the ends sought to be attained. [Citations.]" *Klein v. Department of Registration* (1952), 412 Ill. 75, 78-79.

As we have already determined that the Nursing Home Care Reform Act of 1979 (Ill. Rev. Stat. 1979, ch. 111½, par. 4151—101 *et seq.*) is reasonably related to a legitimate legislative purpose, we must dismiss this argument as well.

For the reasons set forth above, the judgment of the circuit court of Cook County is reversed insofar as it holds portions of the Nursing Home Care Reform Act of 1979 (Ill. Rev. Stat. 1979, ch. 111½, par. 4151—101 *et seq.*), and Illinois Department of Public Health Rules and Regulations promulgated thereunder, unconstitutional. We affirm that portion of the order of the circuit court of Cook County which upholds parts of the Act and parts of the rules and regulations. The cause is remanded to the circuit court of Cook County.

*Affirmed in part and reversed in part and remanded.*