# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Graves v. Rosewood Care Center, Inc.*, 2012 IL App (5th) 100033

---

| | |
|---|---|
| Appellate Court Caption | PAUL GRAVES, Special Administrator of the Estate of Alfred Graves, Deceased, Plaintiff-Appellee, v. ROSEWOOD CARE CENTER, INC., OF EDWARDSVILLE, Defendant-Appellant. |
| District & No. | Fifth District<br>Docket No. 5-10-0033 |
| Rule 23 Order filed<br>Motion to publish granted | February 24, 2012<br><br>April 2, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The verdict for plaintiff in an action under the Nursing Home Care Act for the broken hip suffered by plaintiff's father while staying in defendant nursing home for respite care was affirmed over defendant's arguments that the verdict was against the manifest weight of the evidence, that the trial court erred in the instruction defining neglect and the instructions on the regulations promulgated under the Act, that the trial court should not have given the pattern instruction allowing the jury to draw an adverse inference from a party's failure to produce evidence, and that a bill from another nursing home was improperly admitted in evidence. |
| Decision Under Review | Appeal from the Circuit Court of Madison County, No. 03-L-1166; the Hon. David A. Hylla, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on<br>Appeal | Dennis T. McCubbin, of Claims Administration Services, L.L.C., of St. Louis, Missouri, for appellant. |
| | Robert H. Gregory, of Law Office of Robert H. Gregory, P.C., of East Alton, for appellee. |
| Panel | JUSTICE GOLDENHERSH delivered the judgment of the court, with opinion.<br>Presiding Justice Donovan and Justice Wexstten concurred in the judgment and opinion. |

## OPINION

¶ 1      Plaintiff, Paul Graves, special administrator of the estate of Alfred Graves, deceased, filed suit against defendant, Rosewood Care Center, Inc., of Edwardsville, under the Illinois Nursing Home Care Act (Act) (210 ILCS 45/3-601 to 3-612 (West 2002)), in the circuit court of Madison County. After an initial mistrial for a deadlocked jury, a second trial resulted in a verdict in favor of plaintiff. On appeal, defendant raises issues as to: (1) whether the verdict was against the manifest weight of the evidence, (2) whether the court erred in its issuance of an instruction on the definition of neglect, (3) whether the trial court erred in its issuance of instructions on regulations promulgated pursuant to the Act, (4) whether the trial court abused its discretion by giving an instruction based on (Illinois Pattern Jury Instructions, Civil, No. 5.01 (Supp. 2003) (hereinafter IPI Civil (Supp. 2003) No 5.01)), and (5) whether the trial court erred by admitting into evidence a bill from another nursing home. We affirm.

¶ 2                                    FACTS
¶ 3      In April 2001, plaintiff had his elderly father, Alfred Graves, come to his residence to live. This allowed plaintiff and his wife to tender care to Alfred, who was 79 years old.
¶ 4      In January 2003, plaintiff and his wife took a weeklong vacation to Mexico. Plaintiff made arrangements for Alfred to stay at Rosewood for respite care during the trip. On January 17, 2003, Alfred was admitted to Rosewood. That night, Alfred fell in his room, fracturing his hip. Plaintiff filed suit against defendant under the Act (210 ILCS 45/3-601 (West 2002)).
¶ 5      Plaintiff subpoenaed several of the employees of Rosewood to testify at trial. Steve

Marsho described his job as marketing to the senior community, primarily through hospitals. As part of his job, Marsho would gather preliminary information or assess prospective residents of Rosewood. Marsho stated that Rosewood also advertised its ability to provide respite care.

¶ 6    On January 14, 2003, three days before Alfred's admission to Rosewood, Marsho went to plaintiff's residence in response to Alfred potentially receiving respite care at Rosewood during plaintiff's vacation. Marsho filled out a level-of-care assessment form, which was reviewed in detail during his testimony. Alfred was assessed at level 3 for several aspects of care, including bathing, dressing, continence, and social requirements. The form provided different descriptions of level 3 according to aspects of care, such as full staff assistance for bathing and requiring diaper products for incontinence. Alfred was diagnosed as level 2 for mobility, indicating he required standby assistance or supervision for transfers. Marsho "did not believe" he reviewed this level-of-care assessment with the director of nursing, but stated that he would be "amazed" if it did not reach nursing staff. Marsho testified that room rates were based on the level of assessment.

¶ 7    Jacqueline Hern, formerly a nurse administrator for Rosewood, testified that Marsho's level-of-care assessment would have been placed in Alfred's financial file. Nonetheless, Hern believed that the level-of-care assessment would have been communicated to the nursing staff.

¶ 8    Tanesha Childress, a licensed practical nurse, testified that she worked as the admitting nurse on the evening Alfred arrived. Childress reviewed a form she filled out on Alfred's entry. Childress testified that she never saw a level-of-care assessment form completed by Marsho, and, on review, Childress agreed that her assessment was inconsistent with Marsho's, particularly regarding whether Alfred required standby assistance for supervision and transfers. Childress could not recall where she got the information that would have led her to believe that Alfred was independent with transfers.

¶ 9    Childress also admitted that under a nursing services manual the admitting nurse was to complete a nursing admission checklist within 24 hours of admission of a resident. The first item on the checklist was for the resident to be oriented on how to use the call light and have it in reach. Childress marked on Alfred's chart that he arrived at 6 p.m., but that was the only note she made on his chart.

¶ 10   Nurse Nicole Jacks testified that she worked the night shift starting at 10 p.m. At 11 p.m., Jacks noted on Alfred's chart that, according to the outgoing nurse, Alfred refused to remove his coat or other clothing and was lying on top of his bed. The next note in the chart, marked 12:25 a.m., indicated that Alfred's roommate was in the hallway waving his hands and that Alfred was lying on the floor on his left side in a fetal position. Alfred reported pain in his left hip but denied having hit his head. Alfred stated he did not want to go to the hospital. A delayed entry on the chart indicated that Alfred's roommate indicated that Alfred fell hard. The entry also indicated that when Jacks reoriented Alfred to the call light she discovered the call light was not working and had it replaced.

¶ 11   Plaintiff testified that by late 2002 Alfred had developed significant balance problems. For instance, plaintiff testified that he had told Marsho that Alfred had slipped off the toilet

a couple of times in December despite having a toilet seat extender. Plaintiff also testified that Alfred had suffered from dementia, with his short-term memory "completely gone," and that Alfred was losing weight. Plaintiff described how he was reluctant to leave Alfred alone in the house, even to run to the store for milk, because he was afraid Alfred would hurt himself or accidentally set the house on fire. Plaintiff testified that he and his wife worked different shifts and that one of them was always around Alfred unless he was napping.

¶ 12 On cross-examination, plaintiff admitted that Alfred did not get a cane until 2002 and that he was capable of moving around the lower level of the house with the assistance of a cane. In particular, defendant points to the following exchange:

"Q. [Attorney for defendant:] Did you ever–did he ever call you to help him go to the bathroom?

A. No.

Q. Did he ever need any assistance while he lived there going to the bathroom?

A. As far as what?

Q. Did anybody–did either–you said you never helped him to go the bathroom. Did your wife ever go in and physically walk him to the bathroom? Did he need anybody to do that?

A. Not during the–not really. No.

Q. Okay. And, in fact, in the whole time that he lived in the home, he didn't need anybody to walk around with him and hold on to him while he was walking around, did he?

A. No. He was able to move with his cane.

Q. All right.

A. And he was familiar with the home.

Q. The most he ever needed was a cane.

A. Yes."

¶ 13 Defendant also points to plaintiff's testimony at the end of cross-examination regarding Alfred's having slipped off the toilet seat in December 2002. Plaintiff testified:

"Q. [Attorney for defendant:] How is it that he was able to fall in your home, slip off the toilet?

A. We had a toilet seat extension,–

Q. Uh-huh.

A. –the little plastic–it looks like a big plastic toilet seat that sits on top of a seat to allow them to–to not have to sit down quite as far and apparently that slipped.

Q. I see.

A. Or he lost his balance getting up. I didn't–I didn't see him actually go down on either occasion."

¶ 14 Plaintiff also testified Alfred had his own bedroom and went to the bathroom on his own, with an occasional diarrhea incident. Plaintiff and his wife regularly checked on Alfred but

did not make it a point to get up every night and check on Alfred. Instead, plaintiff would get up and check on Alfred if he heard noises. Alfred never called for assistance to go to the bathroom.

¶ 15    Dr. Wolff, Alfred's physician, was called by defendant. Dr. Wolff testified that Alfred had been seen by a fellow member of his medical group, Dr. Masching, until moving to Florida. The records from Alfred's visit to the group on May 23, 2001, indicate that Alfred was alert and had no neurological deficits. On October 28, 2002, Dr. Wolff personally conducted a physical examination of Alfred and concluded he was elderly and appeared somewhat frail. Alfred was noted as alert but disoriented to place. Dr. Wolff testified that none of the notes indicated Alfred had used a device to help with walking and that his physical exam was consistent with not having a cane.

¶ 16    Dr. Wolff testified that Rosewood was a facility that he routinely rounded once a month. Dr. Wolff testified that the practice was for Rosewood to contact him shortly before admission of any of his patients and that he was contacted by Rosewood shortly before Alfred's admission. Dr. Wolff signed standing admission orders for Alfred's admittance to Rosewood. Dr. Wolff marked the form as "ad lib," meaning Alfred could get up and walk around without restriction. He did not mark Alfred as "up with assist." Dr. Wolff testified that his completion of the form meant that Alfred was not restricted to his bed, nor did he need a nurse to come down to the room and assist him out of bed.

¶ 17    On cross-examination, Dr. Wolff testified that the notes from the October 2002 examination indicated fairly substantial weight loss from 177 to 135 pounds since May 2001 and peripheral neuropathy manifested by pain and burning in his legs. Dr. Wolff also testified that Alfred had been receiving medication that was given to patients with Alzheimer's and that the move to a new environment could exacerbate confusion in an individual suffering dementia.

¶ 18    After the fall, Alfred was seen by orthopedic surgeon Dr. Sola. Dr. Sola performed surgery on Alfred's fractured hip in January 2003. Dr. Sola described the surgery and follow-up visits that ended in July 2003. Dr. Sola testified that by the time of a follow-up examination of March 27, 2003, he had concluded that the fracture had been treated and was in good anatomical alignment. Dr. Sola next saw Alfred on May 8, 2003. Dr. Sola testified:

"Q. [Attorney for plaintiff:] Now, at that point in time, with regard to [Alfred's] ability to ambulate, will you tell the ladies and gentlemen of the jury what problems, if any, he may have been having?

A. He was having difficulty walking secondary to weakness in his legs.

Q. And are you able to determine, doctor, within a reasonable degree of medical certainty as to what the leg weakness was due to?

A. I think in this case his weakness was just due to a period of essentially immobility of not walking. After a fracture of the hip and not walking for a period of time, not everybody regains the mobility. The ambulatory capacity they had prior to the fracture, and I think people that were walking before without any problems before their fracture, all walk fine afterwards, but I think people who are having difficulty walking beforehand are the ones that have more difficulty afterwards.

Q. Okay. And doctor, do you have an opinion as to whether or not [Alfred] obtained his preexisting functions prior to his injury, or do you know? Maybe you do and maybe you don't.

A. It looks like I saw him in July and he was walking without discomfort, but I don't have–I don't have detail here how much he's actually walking.

Q. Okay. If, doctor, [Alfred] indeed was not able to regain his function that he had prior to his injury, do you have an opinion within a reasonable degree of medical certainty as to whether or not [Alfred] may have sustained some degree of disability as a result of his injury?

A. Well, I think that would be the case, if he did not get back to the functional level that he was prior to the injury."

¶ 19 In his notes for several of the visits, Dr. Sola indicated that Alfred was able to ambulate. On cross-examination, Dr. Sola explained the meaning of his notations:

"Q. [Attorney for defendant:] And then you next saw him as planned about a month later on February 26th?

A. Correct.

Q. And again, just like ten days after the surgery, he had no complaints whatsoever at that time?

A. Correct.

Q. And Alfred Graves was ambulating fully weight bearing without any difficulty?

A. Yes. What I'm implying by that he wasn't having pain in his hip.

Q. And even on examination, according to your examination, he had good mobility in the hip?

A. Correct."

Dr. Sola testified that he believed Alfred arrived in a wheelchair for each of his visits, including in July 2003, but that this could be attributed to the long walk to his office from the parking lot.

¶ 20 In April 2003, Alfred transferred to Hitz Nursing Home. Alfred died in September 2004.

¶ 21 After trial, the jury returned a verdict in favor of plaintiff in the amount of $149,115.13. The trial court entered a judgment on the verdict and granted plaintiff's motion for attorney fees.

¶ 22 ANALYSIS

¶ 23 I. Manifest Weight

¶ 24 The Act provides that "[a]n owner, licensee, administrator, employee or agent of a facility shall not abuse or neglect a resident." 210 ILCS 45/2-107 (West 2002); see 210 ILCS 45/1-117 (West 2000). This has been interpreted as being "synonymous with 'ordinary care,' 'due care,' or 'reasonable care'–terms that have been used interchangeably to describe the standard of care for negligence." *Harris v. Manor Healthcare Corp.*, 111 Ill. 2d 350, 367, 489 N.E.2d 1374, 1381 (1986). Indeed, the vital policy of protecting nursing home residents

has been seen as justification for allowing the imposition of treble damages for even negligent acts or omissions. *Harris*, 111 Ill. 2d at 367, 489 N.E.2d at 1381.

¶ 25    Defendant contends that the verdict was against the manifest weight of the evidence and asserts that the jury must have errantly presumed that defendant was negligent merely because a resident fell. See *Flinn v. Four Fountains, Inc.*, 180 Ill. App. 3d 499, 500, 536 N.E.2d 89, 90 (1989). A review of the record, including the evidence presented by plaintiff and the instructions to the jury, indicates that the jury did not operate under such a presumption. In other words, the record supports the jury's verdict that defendant was negligent.

¶ 26    Although defendant provides a list of evidence supporting its case, its argument derives primarily from two witnesses–plaintiff and Dr. Wolff. Arguing that Alfred was independent and mobile, defendant points to several comments made by plaintiff. For instance, plaintiff testified that Alfred had a degree of mobility with his cane and would go to the bathroom without assistance when living at plaintiff's home. Of course, plaintiff also testified that Alfred had recently lost a significant amount of weight, experienced problems with balance, and suffered from dementia.

¶ 27    Defendant also contends that its care of Alfred was in line with the recommendation of Dr. Wolff. Defendant cites to precedent issued before the Act became effective for the principle that Alfred's care was "a medical question entirely within the discretion of the treating physician." *Stogsdill v. Manor Convalescent Home, Inc.*, 35 Ill. App. 3d 634, 665, 343 N.E.2d 589, 612 (1976). Defendant also points out that restraints would be inappropriate without the authority of a physician. *Eads v. Heritage Enterprises, Inc.*, 204 Ill. 2d 92, 100, 787 N.E.2d 771, 776 (2003). Plaintiff's case, however, was not centered on a claim that Alfred needed to be restrained.

¶ 28    Despite defendant's heavy reliance on his testimony, Dr. Wolff's assessment of Alfred was somewhat equivocal. Dr. Wolff found Alfred to be elderly and frail. Dr. Wolff's notes also indicate that Alfred had suffered fairly substantial weight loss and peripheral neuropathy, and at trial, Dr. Wolff testified that the move to Rosewood could reasonably be anticipated to exacerbate confusion in a person suffering dementia.

¶ 29    Defendant's claims about manifest weight practically ignore other evidence presented to the jury. Notably, plaintiff solicited testimony from a former employee of defendant who conducted a home visit in anticipation of Alfred's stay. Marsho testified that he evaluated Alfred as needing a certain level of care and that the rates charged to admittees were based on such assessments. The aspects of care covered by Marsho's evaluation ranged from grooming to transfers to continence issues, but it was apparently never communicated to personnel administering care to Alfred. Plaintiff also presented testimony regarding a missing, or nonexistent, nursing admission checklist and a nurse's flow sheet. Plaintiff also presented testimony from personnel indicating gaps in supervision and faulty equipment, particularly a nonfunctioning call button. The evidence supported the verdict.

¶ 30                                    II. Jury Instructions

¶ 31    Defendant levels numerous arguments against the jury instructions given by the trial

court. Defendant contends both that the trial court erred by issuing an instruction defining neglect and that the instruction errantly defined neglect. Defendant also contests the issuance of instructions on regulations promulgated pursuant to the Act and a missing-witness instruction. Defendant's claims that the instructions implied a presumption of liability or were tantamount to imposing strict liability are without merit.

¶ 32        First, defendant contends that the trial court errantly instructed the jury on the definition of neglect. The Act defines neglect as "a failure in a facility to provide *adequate* medical or personal care or maintenance, which failure results in physical or mental injury to a resident or in the deterioration of a resident's physical or mental condition." (Emphasis added.) 210 ILCS 45/1-117 (West 2000). Defendant asserts that in giving plaintiff's instruction No. 20 the court failed to use the term "adequate."

¶ 33        This argument fails on several fronts. First, plaintiff disputes whether the instruction given to the jury omitted the word "adequate." The transcript indicates that the instruction read to the jury did not contain the word. Nonetheless, the record also indicates that plaintiff tendered a revised instruction containing the word as ordered by the court and that defendant failed to document error by failing to voice objection either when the instructions were submitted to the jury or in a posttrial motion. *Orzel v. Szewczyk*, 391 Ill. App. 3d 283, 287, 908 N.E.2d 569, 573 (2009).

¶ 34        In any event, no prejudice appears to have resulted from the alleged omission. Defendant contends that the error of instruction No. 20 was compounded by other errors in instructing the jury on licensing regulations formed pursuant to the Act. The instructions as a whole, however, properly informed the jury of the standard for liability.

¶ 35        Next, defendant contends that the court erred by issuing an instruction defining neglect and contends that defining neglect confused the jury–in effect offering multiple, conflicting standards of care. See *Chakos v. Illinois State Toll Highway Authority*, 169 Ill. App. 3d 1018, 1027, 524 N.E.2d 615, 621 (1988); *Leary v. Eng*, 214 Ill. App. 3d 279, 283, 573 N.E.2d 352, 355 (1991); *Goad v. Evans*, 191 Ill. App. 3d 283, 306, 547 N.E.2d 690, 705 (1989); *In re Estate of Pirie*, 141 Ill. App. 3d 750, 769, 492 N.E.2d 884, 896 (1986).

¶ 36        Contrary to defendant's contention, the jury was not allowed to choose between several standards of care. Along with the statutory definition of neglect, the jury was instructed that at the time of the occurrence an administrative regulation provided that a facility "shall not neglect a resident." The jury was then instructed, in accordance with IPI Civil (2000) No. 60.01, that "[i]f you decide that a party violated the administrative regulation on the occasion in question, then you may consider that fact together with all the other facts to what extent, if any, a party was negligent before and at the time of the occurrence." See Illinois Pattern Jury Instructions, Civil, No. 60.01 (2000).

¶ 37        The instructions as a whole accurately informed the jury of the standard of care. As with the other instructions defining regulations, the jury was properly informed that the statutory definition of neglect was to be considered with other relevant facts in determining whether defendant was negligent. In other words, defining neglect was not peremptory or directory. See, *cf.*, *Chakos*, 169 Ill. App. 3d at 1028, 524 N.E.2d at 622. The language of IPI Civil (2000) No. 60.01 clarifies the role of rules and regulations in determining the appropriate

standard of care. *Grimming v. Alton & Southern Ry. Co.*, 204 Ill. App. 3d 961, 991, 562 N.E.2d 1086, 1105 (1990); see IPI Civil (2000) No. 60.01, cmt. at 245-46. This role, and its development in Illinois law, was laid out in *Grimming*:

> " 'Evidence of standards, safety rules, regulations, and codes are admissible to aid the finder of fact in deciding the standard of care in negligence actions.' (M. Graham, Cleary & Graham, Handbook of Illinois Evidence, § 406.5 (5th ed. 1990).) In *Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 356 N.E.2d 93, our supreme court extended the rule that a violation of a statute or ordinance that is designed to protect human life is *prima facie* evidence of negligence provided they are validly adopted and have the force of law. (64 Ill. 2d at 390, 356 N.E.2d at 97.) The supreme court found support for its position in the case of *Darling v. Charleston Community Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253, wherein the supreme court permitted the admission into evidence of hospital regulations adopted by the State Department of Public Health. The *Davis* court, citing *Darling*, stated:
>
> > ' "This evidence aided the jury in deciding what was feasible and what the defendant knew or should have known. It did not conclusively determine the standard of care and the jury was not instructed that it did." [33 Ill. 2d at 332, 211 N.E.2d at 257.] Either of the tendered instructions here could well have aided the jury in deciding what plaintiff should have known and done. Likewise, the instructions did not conclusively determine the standard of care, for they provided that if the jury found a violation they could "consider that fact together with all the other facts and circumstances in evidence in determining whether or not a party was contributorily negligent." ' (64 Ill. 2d at 391, 356 N.E.2d at 98.)" *Grimming*, 204 Ill. App. 3d at 991-92, 562 N.E.2d at 1105.

¶ 38    Likewise, the trial court properly issued instructions on the regulations promulgated pursuant to the Act. In addition to issuing the definition of neglect, the court issued instructions containing language from regulations requiring facilities to have written policies and procedures and encouraging ambulation and safe transfers. 77 Ill. Adm. Code 300.3240, amended at 15 Ill. Reg. 554 (eff. Jan. 1, 1991); 77 Ill. Adm. Code 300.610, amended at 13 Ill. Reg. 4684 (eff. Mar. 24, 1989); 77 Ill. Adm. Code 300.1210(a)(5), amended at 31 Ill. Reg. 8813 (eff. June 6, 2007).

¶ 39    Ordinarily, a jury may be instructed on the language of a regulation. *Davis v. Marathon Oil Co.*, 64 Ill. 2d 380, 389-90, 356 N.E.2d 93, 97 (1976); see IPI Civil (2000) No. 60.01, cmt. at 245-46. In order to be used to instruct a jury the regulations must be " 'designed to protect human life or property,' must be 'validly adopted,' and must 'have the force of law.' " *Bulger v. Chicago Transit Authority*, 345 Ill. App. 3d 103, 118, 801 N.E.2d 1127, 1140 (2003) (quoting *Davis*, 64 Ill. 2d at 390, 356 N.E.2d at 97). The regulation must be intended to protected against the alleged injury and the plaintiff must be of a class protected by the regulation. Morever, the plaintiff must present evidence to support a finding that a violation of the regulation was a proximate cause of the alleged injury. *Mikus v. Norfolk & Western Ry. Co.*, 312 Ill. App. 3d 11, 26, 726 N.E.2d 95, 107 (2000).

¶ 40    The instructions meet the criteria. The Act and associated regulations were formulated

to protect against the type of injury alleged by plaintiff. *Harris v. Manor Healthcare Corp.*, 111 Ill. 2d 350, 358, 489 N.E.2d 1374, 1377 (1986). As was stated in *Harris*:

> "The General Assembly enacted the Nursing Home Care Reform Act of 1979 (Ill. Rev. Stat. 1983, ch. 111½, par. 4151-101 *et seq.*) amid concern over reports of 'inadequate, improper and degrading treatment of patients in nursing homes.' (Senate Debates, 81st Ill. Gen. Assem., May 14, 1979, at 184 (statement of Senator Karl Berning).) The Act, described by a principal sponsor as a 'full reform of the nursing home industry' (Senate Debates, 81st Ill. Gen. Assem., May 14, 1979, at 181 (statement of Senator Richard M. Daley)), repealed the Nursing homes, sheltered care homes and homes for the aged Act (Ill. Rev. Stat. 1977, ch. 111½, par. 35.16 *et seq.*) and replaced it with a comprehensive statute which established standards for the treatment and care of nursing home residents; created minimum occupational requirements for nurses aides; and expanded the power of the Illinois Department of Public Health to enforce the provisions of the Act. See generally Daley and Jost, *The Nursing Home Reform Act of 1979*, 68 Ill. B.J. 448 (1980).
>
> ***
>
> To ensure that nursing homes comply with the Act, the General Assembly gave the Department of Public Health expanded regulatory and enforcement powers, and created civil as well as criminal penalties for violations of the Act. (See *People v. Gurell* (1983), 98 Ill. 2d 194.) In addition to the public enforcement provisions, nursing home residents were given several statutory remedies against nursing homes. Senator Daley, in explaining the rationale for including private remedies in the Act, remarked after its passage that, '[d]espite the best of intentions, the government can only do so much to regulate nursing home care. On the other hand, residents are always in the facilities and their friends, relatives and community supporters can regularly keep an eye on the conditions existing in facilities.' Daley and Jost, *The Nursing Home Reform Act of 1979*, 68 Ill. B.J. 448, 453 (1980)." *Harris*, 111 Ill. 2d at 357-59, 489 N.E.2d at 1377.

¶ 41 Defendant points to *Stogsdill v. Manor Convalescent Home, Inc.*, 35 Ill. App. 3d 634, 664, 343 N.E.2d 589, 611 (1976). In *Stogsdill*, the plaintiff filed a cross-appeal against the trial court's directed verdict in favor of a convalescent home and the co-owner and supervisor of the home. *Stogsdill* found no error from the trial court's directed verdict despite regulations requiring written patient care policies. *Stogsdill* found that "[m]oreover these requirements are too vague to be sufficient indicators of the standard of due care required of nursing homes by themselves." *Stogsdill*, 35 Ill. App. 3d at 664, 343 N.E.2d at 611.

¶ 42 *Stogsdill* provides little insight into the case at hand. First, *Stogsdill* noted that, with one exception regarding a written patient care plan, the plaintiff had waived any objection by failing to address the regulations in opposition to the motion for a directed verdict. Furthermore, unlike the case at hand, *Stogsdill* involved a suit against both the supervisor of the home and the attending physician and analyzed the matter as a medical malpractice claim.

¶ 43 The most poignant distinction, however, may be that *Stogsdill* was issued prior to the Act. As *Harris* makes clear, the General Assembly saw a pressing need to enact legislation and regulations to protect those in nursing homes, and it did so after *Stogsdill*. Plaintiff

presented evidence that would support a finding that defendant failed to adhere to each of the instructed regulations and that this conduct was a proximate cause of Alfred's injury. For each regulation, the trial court properly instructed the jury that it could consider the violation, along with other facts, in determining whether defendant was negligent.

¶ 44 Defendant also contends that the trial court erred by giving an instruction based on IPI Civil (Supp. 2003) No. 5.01. Defendant contends that this allowed the jury to draw an adverse inference from the absence of a certified nursing assistant's flow sheet.

¶ 45 The decision whether to issue such an instruction rests in the sound discretion of the trial court. *Hawkes v. Casino Queen, Inc.*, 336 Ill. App. 3d 994, 1009, 785 N.E.2d 507, 519 (2003); *Roeseke v. Pryor*, 152 Ill. App. 3d 771, 780, 504 N.E.2d 927, 933 (1987). The instruction is properly given where the moving party presents some foundation on each of the following: (1) the evidence was under the control of the opposing party and could have been produced through the exercise of reasonable diligence, (2) the evidence was not equally available to each party, (3) a reasonably prudent person under the same or similar circumstances would have offered the evidence if he believed the evidence to be in his favor, and (4) no reasonable excuse for the failure to produce the evidence has been shown. *First National Bank of LaGrange v. Lowrey*, 375 Ill. App. 3d 181, 210, 872 N.E.2d 447, 475 (2007).

¶ 46 Defendant asserts that plaintiff never presented any evidence that such a sheet existed or that defendant was in control of the document. Defendant points to the testimony of nurse Poole, the director of nursing, that, although defendant's policy was to place such a sheet in a resident's file, it "perhaps didn't get filled out since Mr. Graves was only there *** for a very short time," and that "[t]he second possibility is that it got filled out and did not get into the closed record." Nurse Hern also testified regarding the sheet. Although she originally testified that the policy was to destroy such sheets, upon being confronted with charts of other residents, Hern testified that such a sheet should have remained part of Alfred's closed chart.

¶ 47 Plaintiff presented foundation for each element of the instruction. The testimony of Poole alone is sufficient for a fact finder to conclude that the form was routinely prepared. See *Roeseke v. Pryor*, 152 Ill. App. 3d 771, 781, 504 N.E.2d 927, 933 (1987); *Tzystuck v. Chicago Transit Authority*, 124 Ill. 2d 226, 243, 529 N.E.2d 525, 533 (1988). The trial court acted within its discretion by issuing the instruction.

¶ 48 Defendant's final contention is that the trial court erred by allowing into evidence a bill from Hitz Nursing Home for care rendered after Alfred left Rosewood. Defendant contends that all of the medical evidence at trial established that at or shortly after Alfred ended physical therapy he could walk without pain. Defendant also points to testimony from nurse Poole that by the time Alfred was discharged from physical therapy and left Rosewood in April 2003, he was able to walk 400 feet with a wheel walker. On cross-examination, however, Poole testified that her statement was based on having seen a therapy discharge note that Alfred was able to ambulate 200 feet times two. Poole also admitted that the discharge notes for physical therapy indicate that Alfred had not been able to attain long-term goals of the physical therapy plan, including the goals of ambulating 200 feet with standby

assistance without walker, being able to sit to stand independently, being able to sit to lie down independently, and achieving a level of static standing.

¶ 49   Defendant points out that Dr. Sola attributed Alfred's leg weakness to inactivity and not to the fracture and that as of July 2003, Alfred "was walking without discomfort." The entirety of Dr. Sola's testimony, however, reveals follow-up exams were concerned with the effects of the surgery. Although Dr. Sola was certain that the surgery was successful, he did not testify that Alfred had returned to his level of functioning prior to the fall. As plaintiff points out, Dr. Sola did not note in detail whether Alfred was able to walk and testified that Alfred arrived for his visits in a wheelchair. Dr. Sola testified that "not everybody regains the mobility" and that "people who are having difficulty walking beforehand are the ones that have more difficulty afterwards."

¶ 50   Indeed, Dr. Sola opined that if Alfred had not regained the level of function that he had before the fall, then it would be attributable to the fall. The record supports the finding that Alfred had not recovered. In addition to Alfred failing to meet the long-term goals of physical therapy, plaintiff testified that even after the therapy was completed, Alfred was at most able to stand and bear weight and was never able to walk again. Plaintiff testified that after Albert's fall, he and his wife were not able to care for Alfred at home. The trial court properly admitted the bill from Hitz and allowed the jury to consider the matter.

¶ 51   On appeal, plaintiff requests that this court remand the case to the circuit court with instruction for determination of additional attorney fees and costs. Plaintiff points to *Rath v. Carbondale Nursing & Rehabilitation Center, Inc.*, 374 Ill. App. 3d 536, 544, 871 N.E.2d 122, 130 (2007). As in *Rath*, plaintiff does not point to any pleading in the record requiring remand with instruction, and thus the case is simply affirmed. We note, however, that pursuant to *Berlak v. Villa Scalabrini Home for the Aged, Inc.*, 284 Ill. App. 3d 231, 243-44, 671 N.E.2d 768, 776 (1996), plaintiff is entitled to submit a supplemental petition to the trial court for attorney fees and costs incurred during the appellate process.

¶ 52   Affirmed.